## STATE OF MINNESOTA *vs.* WINONA & ST. PETER RAILROAD COMPANY.

### April 22, 1875; May 20, 1875.

**Railroad Company—Exemption of Land Grant from Taxation until Sold and Conveyed—Contract to Convey held Equivalent to a Conveyance.**—The W. & St. P. R. Co. became entitled to receive, and received, lands for constructing its road, under the act of May 22, 1857, entitled, "an act to execute the trust created by an act of Congress, entitled, ' an act making a grant of land to the Territory of Minnesota, in alternate sections, to aid in the construction of certain railroads in said territory, and granting public lands in alternate sections to the State of Alabama, to aid in the construction of a certain railroad in said state,' and granting certain lands to railroad companies therein

named," and other acts amendatory thereof, and supplemental thereto.  Before the lands were conveyed by the state to the company, the latter, being indebted to B. and associates for money advanced to it, and for constructing one hundred and five miles of its railroad, made a contract with them, in writing, whereby it agreed, in part payment of such indebtedness, to sell, and as soon as it should acquire the title from the state, to convey to them, or such persons as they might designate, so many acres of the land to which it was entitled, as it should be entitled to, and receive, for constructing the one hundred and five miles, to be selected by commencing at Winona, and proceeding westward, taking all the lands along the line of the road, till the number of acres should be got.  There was a clause in the contract, which, in effect, gave to B. and his associates the option, instead of taking a conveyance, to leave the title in the company, and have it dispose of the lands for their benefit.  The lands are claimed to be exempt from taxation under § 4, ch. 2, of the act herein entitled.  *Held*, that as the entire consideration for the lands had been received by the company, the entire equitable and beneficial ownership of the lands was vested by the contract in B. and his associates, and the company held the legal title, from the time of the conveyance by the state to it, only in trust for them; that the contract was such a sale and conveyance as § 4, ch. 2, of the act contemplates, and that the lands are subject to taxation.

**Covenants, Dependent and Independent.**—Where, by the terms of a contract, the time to perform the covenant on the one side, is to happen, or may happen, before the time for the performance of the covenant on the other side, the former is not dependent on the latter.

Proceeding in the district court for Waseca county, under ch. 1, Laws 1874, to enforce the collection of delinquent taxes against certain lands in that county, being a part of defendant's land grant.  Defendant answered, claiming that the lands were its property, and that, by its charter, they were exempt from taxation.  See *State* v. *Winona & St. Peter R. Co.*, *ante*, p. 315.

At the trial before *Lord*, J., it was agreed that defendant still held the legal title to the lands, and the only question made was whether a certain contract, the material parts of which are set out in the following opinion, was, in effect, a conveyance of the lands, so as to render them subject to taxation.  The court ruled that the lands were properly taxed, and certified the case to this court, under § 120 of the act before cited.

*Geo. P. Wilson*, Attorney General, for the State.

*Wilson & Taylor*, for defendant.

GILFILLAN, C. J.   Certain lands, the legal title to which stands in this company, were placed on the tax lists for the year 1873, and taxes levied and assessed thereon.   In the proceedings to enforce payment of taxes on real estate remaining delinquent on the first day of June, 1874, for the county of Waseca, the company filed answers as to taxes on these lands, claiming that they are exempt from taxation under § 4, ch. 2, of the act of the legislative assembly of the Territory of Minnesota, entitled, "An act to execute the trust created by an act of Congress, entitled, 'An act making a grant of land to the Territory of Minnesota, in alternate sections, to aid in the construction of certain railroads in said territory, and granting public lands in alternate sections, to the State of Alabama, to aid in the construction of a certain railroad in said state,' and granting certain lands to railroad companies therein named," approved May 22, 1857.   The lands in question came to this company under this act, and other acts amendatory and supplemental thereto.

The company executed a contract October 31, 1867, with one Danford N. Barney and others.   The material parts of this contract are as follows :

" Whereas the said parties of the first part (Barney and his associates) have, at and upon the request of the said party of the second part, (the company,) loaned and advanced large sums of money to the party of the second part, and made, constructed and equipped one hundred and five miles of the railroad of the said party of the second part, in the State of Minnesota, and the said party of the second part is indebted to the said parties of the first part in a large sum of money on account thereof:

"And whereas, the parties have agreed upon the terms of liquidation, settlement and payment of all such indebtedness, and the adjustment of the matters. between them, on the terms hereinafter named :" (it then goes on to state how certain portions of the indebtedness have been and are to be paid, and continues :)

"And whereas, the said party of the second part is, or claims to be, entitled to have and receive, under the several acts of congress passed in aid of the construction of said railroad, a certain number of acres of land, supposed to be about six hundred thousand acres, for constructing the portion of said railroad now constructed, to wit, one hundred and five miles of railroad:

" Now, therefore, for the residue of the said indebtedness of the said party of the second part to the said parties of the first part, the said party of the second part hath agreed to sell and convey to the said parties of the first part, as many acres of land heretofore granted by congress to the State of Minnesota as the said party of the second part shall receive from said state by reason of the construction of the portion of the Winona & St. Peter Railroad heretofore constructed, to wit: one hundred and five miles thereof, extending westwardly from Winona, excepting and reserving, nevertheless, any and all parts and parcels of such lands, (if any such there be,) which may be necessary for the track of said railroad, or the right of way, or any depot or depot grounds thereof, or any other purpose incidental to the operation of the said railroad, constructed or to be constructed, or any part thereof, which said lands hereinbefore agreed to be sold, shall be conveyed to the said parties of the first part, or as they shall in writing direct, whenever and as soon as the said party of the second part shall obtain the title thereto under such acts of congress. The lands to be conveyed as aforesaid, shall be selected as follows :" (it then proceeds that the lands shall be selected by commencing at Winona, and proceeding westward, taking all the lands along the line of the road, till the number of acres to which the company is entitled for the hundred and five miles is obtained, and proceeds :)

"And the said party of the second part agrees to acquire the title of said lands as fast as it may be permitted to do under said act of congress, and to release and convey to the said parties of the first part, or to such person or persons,

in such manner, and from time to time, as may be desired by the said parties of the first part, or their counsel, on the request of the said parties of the first part, or a majority of them, and will do any other act and thing necessary and proper to secure the said parties of the first part the said lands, and every part and parcel thereof, and the proceeds thereof, if it shall be hereafter determined that the same shall be sold by the said party of the second part, for the benefit of the said parties of the first part; and until the final arrangement shall be made in reference thereto, the title shall be held by the said party of the second part; and as some time is necessary to enable said parties of the first part to confer and agree upon the details in relation to the holding of the title, and the mode of disposing of said lands, this clause is inserted to express the agreement of the parties in relation thereto. * * *

"And the said party of the second part further agrees, in consideration aforesaid, that it will not, at any time hereafter, encumber, by mortgage or otherwise, the said lands hereinbefore described, and which, by the terms of this agreement, are to be conveyed to the parties of the first part, or as they shall direct.

"And the said parties of the first part further agree that all the expenses of procuring title to such lands, and the expenses of any and all conveyances which shall be made of said lands, shall be paid by the parties of the first part."

There was a stipulation by Barney and his associates to pay all the debts of the company up to November 1, 1867; but as the covenant to convey was not made to depend on that, it is not necessary to quote it.

The lands involved in these proceedings are a part of those described in the contract. After the making of this contract, the lands were conveyed by the state to the company, and they have never been conveyed by the company, nor disposed of, except by this contract, and except that in pursuance of it, they are held for sale, and contracted to be sold, and parcels of them sold by the company, from time

to time, as purchasers can be procured.   The contract is still in force and unchanged.

As appears from the contract, the entire consideration for the sale of the lands was received by the company before the contract was made.   It is therefore a sale of the lands, with a covenant to convey.   As it was not executed with the requisite formalities required for conveyances of real estate, the legal title remained in the company ; but as the entire consideration had been paid, the equitable title passed to the purchasers, and the company, upon acquiring the legal title, held, and now holds it as trustee for them, the entire beneficial interest in the lands being in them.   The provision in the contract giving them the option to leave the legal title in the company, and have it sell the lands for their benefit, does not change the relations of the parties, nor the character of their respective rights.   The title is still held by the company, subject to their order.

Section 4, of the act of 1857, under which the exemption is claimed, reads : " The said lands so granted shall be and are exempted from all taxation, until the same shall have been sold and *conveyed* by said company.   In consideration of the grant of land and other franchises and privileges hereby confirmed in and conferred on the Transit Railroad Company, the said company shall pay into the treasury of the Territory or State of Minnesota three per cent. upon all the gross earnings of said road, the amount of the gross earnings to be ascertained by the verified statement of the president and treasurer of said company, as hereinbefore provided for ; and the said three per cent. shall be so paid into the treasury of the Territory or future State of Minnesota, within sixty days after any portion of the said road shall be operated, and annually thereafter ; *and the same, when paid, shall be in lieu of all taxes whatever.*"

This is a contract between the state and the company, and, whether it is provident or improvident, each must abide by it, according to its true intent.   The question here is, was the contract with Barney and his associates such a convey-

ance as is contemplated by the section? There would be no doubt as to this, were it not for the use, in the section, of the technical term, "convey." Construed literally, it means the transfer of the legal title. Whether it is to be taken in its technical sense, as referring to a transfer of the legal title, or in a larger sense, as referring to a transfer of the entire equitable and beneficial ownership, must be determined, not by the word alone, but by the context in which it is used, and the manifest purposes for which the exemption was granted.

In consideration of the grant of lands, and other franchises and privileges,—among them the exemption,—the company was to pay three per cent. upon its gross earnings, and the section states that "the same, when paid, shall be in lieu of all taxes whatever." This three per cent. is provided as a commutation for all taxes which, but for the exemption, the company would have to pay. It cannot be considered a commutation for taxes which the company would not have to pay, nor for taxes the levy and collection of which would in no way affect its interests. The legislature never intended thus to commute the taxes of any person but the company, nor to relieve any other person from the burden of taxation. The three per cent. is the tax which the company pays upon all its property, of whatever character.

The object of the act was to secure the construction of the road with the lands granted by congress for that purpose. The commutation for public burdens imposed upon property was one of the inducements held out to the company to undertake the enterprise. Were the property of the company to be taxed according to its assessed value, while the road earned but little, and the lands were unsalable, it might be a very serious burden, the prospect of which might have prevented parties undertaking the construction and operating of the road ; and so the tax is to be imposed, not according to the assessed value of the company's property, but according to its ability to pay, that is, according to the amount of its earnings. It was contemplated that the road would be con-

structed, and perhaps for a time maintained, from the proceeds of the lands granted, and also that it might be a considerable time before those proceeds could be realized by sales ; and if, while unable to realize by sale, the lands were to be subject to taxes, the actual proceeds would be thereby diminished, and the ability of the company to construct and maintain its road, from such proceeds, proportionately impaired. To avoid this was manifestly the purpose of the exemption, and the exemption is to be extended only so far as is necessary to effect that purpose. It cannot be claimed that the company can sell or give to any other person the benefit of the exemption.

Now, when the company has sold the lands, and realized the proceeds, and retains no lien upon, nor actual interest in the lands, even though it retains the naked legal title only as trustee for the purchaser, it is a matter of indifference to its interests, and to its ability to operate the road, that the lands are taxed. If taxes are assessed, it need not pay them. If the lands are sold for the taxes, it loses nothing. In the case before us, if the exemption still continues, it continues not for the benefit, in any way, of the company, but solely and exclusively for the benefit of Barney and associates. If the exemption is preserved by the company retaining the naked legal title, as trustee for the purchasers, then it may, in effect, sell or transfer to another what was intended for its exclusive benefit, and not for the benefit of its purchasers. No such result could ever have been intended in the act of 1857. We, therefore, conclude that the lands were sold and conveyed, within the meaning of § 4 of that act, by the contract with Barney and his associates, and that they are subject to taxation.

Cases somewhat analogous to this have been before the Supreme Court of the United States. The inhibition upon the states to tax the property of the federal government is as effectual an exemption of its lands as the act of 1857 was of the lands of this company ; but when public land has been sold and paid for, although no patent has issued, the

supreme court, upon the ground that the land is the property of the purchaser, and the United States merely a trustee of the legal title, holds that it is subject to taxation by the states. *Carroll* v. *Safford*, 3 How. 441; *Witherspoon* v. *Duncan*, 4 Wall. 210. The judgment below, sustaining the tax, is affirmed.

----

The defendant having moved for a re-argument of the case, the motion was, after argument and consideration, denied, the following opinion being filed on May 20, 1875.

GILFILLAN, C. J. After the decision of this case at this term, the company made a motion for leave to re-argue the point that the covenant of the company to convey the lands to Barney and others is a dependent covenant. That point was fully considered by the court in arriving at a decision; but as its importance was, perhaps, not felt by the counsel in arguing the case, and as the interests involved are of great magnitude, we have permitted it to be fully discussed on the motion for a re-argument. Having heard the motion, we see no reason for changing our first opinion.

It is contended that the company's covenant to convey is dependent on two covenants on the part of Barney and his associates. The first of these is as follows: "And it is further agreed by and between the parties hereto, that the said parties of the first part shall have and take all the cash assets of the said party of the second part, up to the first day of November, 1867, and that the said parties of the first part shall assume and agree to pay, and that they shall fully pay and discharge all the floating debts of the said party of the second part, up to the said first day of November, 1867, and all liabilities to that date, except bonded debt, and including the interest to said first day of November, 1867, which shall have accrued upon the outstanding bonds of the party of the second part, and which will amount at said date to the sum of forty-nine thousand dollars. And the said parties of the first part hereby covenant, promise and agree, to and with the said party of the second part, that

the said parties of the first part shall and will receive and accept the property and things hereinbefore agreed to be transferred to them, in full payment, satisfaction and discharge of all indebtedness of the said party of the second part to the said parties of the first part, or either of them.''

In a preceding part of the contract, quoted in the opinion, it is stated that the company agrees to convey the lands for the *residue of the indebtedness* due to Barney and associates, left after paying off a part of the original indebtedness, by issues of bonds. Such residue was, therefore, the consideration for the company's covenant to convey. The cash assets up to November 1st, to be turned over to Barney and associates, are the consideration for their covenant to pay off the floating debts, and accrued interest on the bonds. The two covenants are not each the consideration for the other, but they have independent considerations.

There is no time set within which they are to pay off the floating debts. If they were all then due,—and whether they were due, or not, does not appear,—Barney and associates were entitled to a reasonable time within which to pay them off. If not then due, they could not be called on to pay them until they became due. The covenant of the company is to convey the lands '' as soon as the said party of the second part shall obtain title thereto,'' an event which might happen before Barney and associates could be required to pay off the debts of the company. This we think is decisive that the covenants are not dependent; for where, by the terms of the contract, the time to perform the covenant on the one side, is to happen, or may happen, before the time for the performance of the covenant on the other side, the former is not dependent on the latter. *Couch* v. *Ingersoll*, 2 Pick. 292; *Seers* v. *Fowler*, 2 John. 272; *McCoy* v. *Bixbee*, 6 Ohio, 312.

The other covenant upon which it is claimed the company's covenant to convey depended, is as follows: ''And the said parties of the first part further agree that all the expenses of procuring title to such lands, and the expenses

of any and all conveyances which shall be made of such lands, shall be paid by the parties of the first part.'' The conveyances here referred to must be those made by the company, if Barney and associates concluded to leave the title in the company, and let it sell for them, that is, conveyances to be made after their right to a conveyance from the company becomes perfect. This agreement is not to pay to the company the expenses of procuring the title to the lands. It is not for the benefit of the company, except that it qualifies its previous covenant to acquire the title of the lands as fast as it might be permitted to do, under the laws of congress. The company would have no right to charge anything for its trouble or services, or the trouble or services of its officers, in acquiring the title; and but for the agreement of Barney to pay the expenses, it would have to pay all fees of land officers and others, in connection with acquiring the title from the government. That agreement relieved the company from that duty, and imposed it on the other parties, so that the company was to do all that was necessary in order to acquire the title, except to pay those expenses. It is not to be presumed that the company paid money, which, by the terms of the contract, was to be paid by the other parties; and if it did, its right to reimbursement would have to rest upon something outside of this contract. The motion is denied.