# THE DISTRICT OF COLUMBIA

## *v.*

# THE METROPOLITAN RAILROAD COMPANY.

STREET RAILROAD ; CHARTER OBLIGATION TO PAVE ; BOARD OF PUBLIC WORKS ; INTEREST ; STATUTE OF LIMITATIONS.

1. Under the acts of Congress which constitute the charter of the Metropolitan Railroad Company, the duty of paving and keeping well paved and in good condition the spaces in certain streets allotted for the use of its tracks did not arise until rails were laid and tracks constructed on some appreciable portion of its line.   Mr. Justice SHEPARD *dissenting*.

2. Merely laying sleepers and crossties in streets along which it was proposed subsequently to construct its tracks, the work being done with the permission of the Board of Public Works, who were at the time engaged in paving such streets, the railroad company not being then in a position to construct its tracks and having under its charter considerable time in which to do so, was not such an occupation of the streets as to impose upon the company the liability to pay for the paving done on the spaces subsequently occupied by its tracks.   Mr. Justice SHEPARD *dissenting*.

3. It was within the statutory power and right of the Board of Public Works, in the exercise of the power conferred by Congress in respect of the streets and avenues of the city, to determine to change the character of the pavement in certain streets along which the company had constructed its tracks and was operating its road, and to require the company to substitute on the spaces prescribed by its charter, instead of the pavement formerly laid by the company, the new pavement directed to be laid on the remainder of the highway ; and on the failure of the company so to do, after due notice to it, to put down the pavement itself by its own contractors, and charge the cost to the railroad company.

4. And the fact that the substituted pavement proved worthless and unfit for the purposes of the company and had to be removed and replaced by the company at its own expense with a pavement similar to that formerly in existence, will not relieve the company from the obligation to pay for the work done on its behalf by the Board of Public Works.

5. The operations of the Board of Public Works, as far as they could

be the source of resultant right or liability, have been so frequently recognized by Congress that they must be held to have been validated to the same extent as if they had been authorized in the first instance. The objection, therefore, that the Legislative Assembly never authorized the paving of the streets involved in this case, and that the proceedings of the Board of Public Works were for that reason null and void, cannot be sustained.

6. Where a debt that ought to be paid at a particular time is not then paid through the default of the debtor, compensation in damages equal to the value of the money, which is the legal interest upon it, will be allowed during such time as the party is in default, provided a claim for such interest be made in the declaration.

7. The statute of limitations operates upon the remedy, not upon the right; and a judgment sustaining a plea of the statute does not extinguish any legal right of the plaintiff, but merely determines that he has lost his remedy.

No. 442. Submitted February 12, 1896. Decided March 24, 1896.

HEARING on cause transferred to this court from the Supreme Court of the District of Columbia by the act of Congress of August 2, 1894, for final determination. *Judgment for plaintiff.*

The COURT in its opinion stated the case as follows :

This is a cause specially referred to this court by an act of Congress of August 2, 1894 (28 Stat. 218), for the final adjustment and determination of a long pending litigation and controversy between the parties, and it has been referred to us to be determined as a case of original, not of appellate, jurisdiction. The record before us, however, is mainly the record of the litigation in the Supreme Court of the District of Columbia, as affected by a decision of the Supreme Court of the United States.

On November 27, 1880, suit was instituted by the District of Columbia at common law in the Supreme Court of the District to recover from the Metropolitan Railroad Company the sum of $161,622.52 for work alleged to have been done and materials claimed to have been furnished by the District of Columbia in paving certain streets and avenues of the cities of Washington and Georgetown at various

times in the years from 1871 to 1875, both inclusive, in consequence of the alleged failure of the railroad company to do the work and furnish the materials, which it is claimed it was its duty to do and furnish under its charter.

The Metropolitan Railroad Company was incorporated by an act of Congress of July 1, 1864 (13 Stat. 326), for the purpose of constructing and operating a street railway, with carriages to be drawn thereon by horse power, along certain specified streets in the city of Washington from the neighborhood of the Capitol to the western or southwestern part of the city. In this act were contained the following provisions bearing upon the present controversy :

" Section 4. That the said corporation hereby created shall be bound to keep said tracks, and for the space of two feet beyond the outer rail thereof, and also the space between the tracks, at all times well paved and in good order, without expense to the United States or to the city of Washington."

" Section 5. That nothing in this act shall prevent the Government at any time, at their option, from altering the grade or otherwise improving all avenues and streets occupied by said road, or the city of Washington from so altering or improving such streets and avenues, and the sewerage thereof, as may be under their respective authority and control ; and in such event it shall be the duty of said company to change their said railroad so as to conform to such grade and pavement."

And it was also provided in the same act that " the use and maintenance of the said road shall be subject to the municipal regulations of the city of Washington within its corporate limits."

The time for the construction of the road, which in this act had been limited in part to four months and in part to one year after the organization of the company, was extended by an act of January 30, 1865 (13 Stat. 426), and again by an act of March 3, 1865 (13 Stat. 536), which to some extent altered the route of the road. A further ex-

tension of the time for completion was granted by an act of March 2, 1867 (14 Stat. 440); and finally by an act of March 3, 1869 (15 Stat. 339), an extension of five years thereafter " for the completion of its lines of street railways." At that time, its main line, so called, from the neighborhood of the Capitol along New Jersey avenue, C street, D street, Indiana avenue, Louisiana avenue, Fifth street, F street, Fourteenth street, H street, and Seventeenth street to New York avenue, seems to have been completed and in operation, but the other branches authorized had not been commenced.

In the meantime, by an act of Congress of July 13, 1868 (15 Stat. 85), another street railroad company, designated as " The Connecticut Avenue and Park Railway," had been incorporated to construct and operate a street railroad in the city of Washington from the intersection of Seventeenth street and Pennsylvania avenue, along Seventeenth street and Connecticut avenue to Boundary street, and from Boundary street into Washington County. The charter of this company contained the same provisions in regard to the paving of its tracks and for two feet beyond the outer rails as were inserted in the charter granted to the Metropolitan Railroad Company. The franchise of the company was subsequently acquired by the Metropolitan Railroad Company, which thereafter continued to operate and own it, and consequently became subject to the provisions as to paving contained in the charter equally as to the provisions in its own original charter with respect to its original lines. The acquisition of the franchise of " The Connecticut Avenue and Park Railway Company " by the Metropolitan Railroad Company, together with all the rights, duties and obligations of the former company, seems to have occurred in the year 1874.

Again, another street railroad company was authorized by an act of the Legislative Assembly of the District of Columbia, under date of January 19, 1872, and was empowered to construct a railroad from the corner of Seven-

teenth and H streets, where it was to connect with the Metropolitan Railroad, thence along Seventeenth street, Connecticut avenue, P street, over the Rock Creek bridge to West street in Georgetown, and thence along West street and over certain other streets in Georgetown not necessary here to be enumerated. The franchises of this company also, which seems to have been subsequently recognized by Congress, were in course of time acquired by the Metropolitan Railroad Company, which likewise at the same time assumed its duties and obligations, and among these a duty of paving and keeping in good order substantially the same as in its own original charter.

Meanwhile a new era of municipal or governmental organization had been inaugurated in the District of Columbia. By an act of Congress of February 21, 1871 (16 Stat. 419), the municipalities of Washington and Georgetown were abolished, and a new municipal organization, comprising the whole of the District of Columbia, was established, with a governor, a local legislature and a board of public works. To this last named body was committed by the act the control of the streets and avenues of the city of Washington, and presumably also of those of Georgetown. The grant of power to it, so far as it seems to bear upon the questions involved in this controversy, was in the following terms :

" The Board of Public Works shall have entire control of and make all regulations which they shall deem necessary for keeping in repair the streets, avenues, alleys and sewers of the city, and all other works which may be entrusted to their charge by the Legislative Assembly or Congress. They shall disburse, upon their warrant, all moneys appropriated by the United States or the District of Columbia, or collected from property holders, in pursuance of law, for the improvement of streets, avenues, alleys and sewers, and roads and bridges, and shall assess in such manner as shall be prescribed by law, upon the property adjoining and to be specially benefited by the improvements authorized by

law and made by them, a reasonable proportion of the cost
of the improvement, not exceeding one-third of such cost,
which sum shall be collected as all other taxes shall be col-
lected.    *    *    *

"All contracts made by the said Board of Public Works
shall be in writing, and shall be signed by the parties making
the same, and a copy thereof shall be filed in the office of
the Secretary of the District. And said Board of Public
Works shall have no power to make contracts to bind said
District to the payment of any sums of money except in
pursuance of appropriations made by law, and not until such
appropriations shall have been made."

Thereupon the newly created legislature of the District of
Columbia, by an enactment under date of July 10, 1871,
authorized a comprehensive plan of public improvements, as
it was called, prepared by the Board of Public Works, and
appropriated $4,000,000 to carry it into effect, the money
for which it provided should be raised by the issue of bonds
to that amount at their par value. Thereupon the Board
of Public Works entered vigorously upon the execution of
its comprehensive plan, and thereafter continued its remark-
able career without any legal or authorized plan and with-
out check for nearly three years, until it was abolished on
June 20, 1874.

In the so-called "comprehensive plan" none of the
streets or avenues seem to have been included on which
the Metropolitan Railroad Company, or either of the other
two railroad companies whose franchises it acquired, had
been authorized to construct railroad tracks. But either
with or without legislative sanction or authority, the Board
of Public Works proceeded to improve all such streets and
avenues, among others, by grading and paving them, and
the pavement selected was either wood, concrete (so-called),
Belgian block, or, in the case of one of the streets in George-
town, cobble-stones. These pavements were all laid during
the years 1872 and 1873, the last of them being finished on
January 15, 1874.

At that time only the main line of the railroad company, that between the Capitol and the intersection of Seventeenth street with New York avenue, was in operation.   The other lines had not been constructed.   The main line had been paved throughout its whole length, in accordance with the requirements of the charter, the pavement being of cobblestones, which was suitable for the operations of the road and which was in good order and condition and entirely satisfactory to the authorities of the District of Columbia.   At least it is so stated in the stipulation of the parties filed in this case ; and it is added that this pavement, which had been laid entirely by the railroad company at its own expense, was especially fit and suitable for its purposes in view of the nature of the operations of the railroad company and the service required of it.

The Board of Public Works, however, without any notice to the railroad company, entered into contracts for the paving of all these streets and avenues, without reference to the railroad company or its occupation of the streets, the contract in each case being for the whole carriage-way from curb to curb, regardless of the railroad tracks and of the spaces occupied by the company, and which, under its charter, the company was required to keep in good order and repair.   The contractors proceeded to tear up the cobble-stone pavements, and to lay the pavement of wood and concrete, of which wood was for the most part used.   The railroad company protested to the Board of Public Works against the change, and offered to relay the cobble-stones at its own expense, but the protest was in vain.   The contracts were all carried into effect and the pavements laid.   They were found so worthless, however, in a very short time, so badly constructed and so utterly useless for the purposes of the railroad company, so unsuitable, in fact, to their necessities, that the company found itself compelled very soon to take them up, and with the consent of the authorities of the District and at their own expense, to replace them with a new cobble-stone pavement.   The pavements put down by

the contractor for the Board of Public Works had all rotted or crumbled and become dangerous.

No assessment was made against the railroad company at that time for any of these new pavements, except in two cases. Under the authority given to the Board of Public Works, one-third of the whole cost was assessed against the owners of the abutting property and two-thirds to the District of Columbia. The two excepted cases were one on Seventeenth street and one on Fourteenth street, where it was sought to hold the railroad company as an abutting owner. For the paving of Seventeenth street from New York avenue to I street an assessment was made against the company of $7,362 ; and for the paving of Fourteenth street at the intersection of New York avenue there was an assessment against it of $444.80 ; and for both of these sums certificates of indebtedness were issued by the Board of Public Works in presumed accordance with the law, and sold by the authorities of the District of Columbia in 1874 to the First National Bank of New York, which has ever since remained and yet remains the owner of them.

The abuses of the Board of Public Works and of the so-called territorial organization of the District of Columbia induced Congress to abolish the entire system, and by an act of June 20, 1874 (18 Stat. 116), a temporary government by commissioners was appointed for the District. By the same act there was a board of audit created to ascertain and adjust the indebtedness of the District of Columbia ; and among other duties, this board of audit was charged to " ascertain and report to Congress at the next session thereof the amount equitably chargeable to the street railway companies on account of paving along and within the tracks of said companies, pursuant to the charter of said companies, or the acts of Congress relating thereto, together with their reasons therefor." The board of audit reported to Congress on February 15, 1875, the contention of the District and of the railroad companies, and the charges, as above stated, made by the Board of Public Works against the Metropoli-

tan .Railroad Company for Seventeenth and Fourteenth streets ; but they did not find or report that any sum whatever was equitably chargeable against the railroad companies.

The question of the indebtedness of the street railroad companies to the District of Columbia remained a mooted question, and seems to have been agitated in the office of the Commissioners at various times from 1874 to 1878. One or more of the attorneys for the District during that period appear to have advised the Commissioners that from these railroad companies there was nothing justly due to the District of Columbia in respect to this matter of paving.

By an act of Congress of June 11, 1878, a permanent form of government for the District of Columbia by Commissioners was established, and these Commissioners, acting under a previous act of Congress of April 3, 1878 (20 Stat. 34), and also under two statutes passed soon afterwards, that of June 19, 1878 (20 Stat. 106), and that of June 27, 1879 (21 Stat. 36), ordered a general revision of all assessments. In this revision for the first time, except in the two instances already mentioned, a charge appeared against the Metropolitan Railroad Company in respect of the paving of the streets occupied by its railroad lines. The cost of the paving of the spaces for which the railroad company was assumed to be responsible under its charter, was deducted from the general cost ; drawbacks were issued therefor to the abutting property holders ; and the amount, which was the sum of $161,622.95, was charged on the books of the District against the railroad company. Demand was made on the company on February 28, 1880, for payment, and compliance with the demand refused.

The Commissioners soon afterwards reported to Congress their action in the premises ; but stated that, in view of the previous legislation on the subject and the failure of Congress to take any action on the report of the board of audit, they deemed it advisable to await further legislation on the subject. No further legislative authority or direction was given. But notwithstanding this, suit was instituted in the

Supreme Court of the District of Columbia on November 27, 1880, for the recovery of the whole amount claimed, $161,622.95 ; and this suit is the basis of the proceedings now before us.

An amended declaration, which is the declaration that appears in the record before us, was filed on February 10, 1882. The defendant railroad company interposed twelve pleas as a defence, eight of them amounting only to the general issue, two alleging want of proper notice to the defendant, and two being pleas of the statute of limitations. On demurrer to the pleas of the statute of limitations, the pleas were overruled by the General Term of the Supreme Court of the District (1 Mackey, 361) ; and the cause went to trial on the other issues, resulting in a verdict of $147,507.05 for the District of Columbia. The judgment thereon was sustained by the General Term (4 Mackey, 217) ; but upon writ of error the Supreme Court of the United States reversed the judgment of the General Term on the ground that the claim was barred by the statute of limitations (132 U. S. 1), and remanded the cause with directions to enter judgment for the defendant on the demurrer to the pleas of the statute. This was on October 21, 1889.

Thus the matter rested for upwards of four years, but not without effort on the part of the authorities of the District of Columbia to compel the railroad company to pay the amount which had been claimed from it. Induced by the representations of these authorities, Congress, by an act of March 3, 1891 (26 Stat. 870), required the railroad company to pay within eighteen months thereafter the whole amount of the judgment that had been entered against it by the Supreme Court of the District of Columbia, with interest and costs, and ordained that, upon the failure of the company so to pay, the charter of the company should become forfeit, and all its rights, privileges and franchises as a body corporate should cease and determine. In the same paragraph of the same act, which was the deficiency appropriation act for the year ending June 30, 1891, and

which made an appropriation for the payment of the costs incurred by the District of Columbia in the legal proceedings mentioned, there was a similar requirement in regard to a similar judgment against the Washington and Georgetown Railroad Company. This latter company complied with the requirement, but the Metropolitan Railroad Company declined to do so ; and proceedings were instituted against it in the Supreme Court of the District of Columbia by the Attorney-General in the name of the United States, by writ of *quo warranto* to forfeit its charter.

While these proceedings were pending, Congress, which by a clause in an appropriation act of August 6, 1890, had authorized and required a change in the motive power of the street railroads in the District, provided by an act of July 22, 1892 (27 Stat. 399), for an extension of one year thereafter for the Metropolitan Railroad Company to comply with the requirements of the previous act. And this being deemed inconsistent with the further prosecution of the *quo warranto* to forfeit the charter, these proceedings were discontinued.

Being engaged in the prosecution of experiments to ascertain the best motive power for street railroads, the Metropolitan Railroad Company again applied to Congress for an extension of time to comply with the act of August 6, 1890 ; and by an act of August 2, 1894, Congress authorized the extension, and at the same time directed the reference to this court of the long pending controversy between the railroad company and the District of Columbia for final determination, to which reference both parties acceded. The section of the act by which this was done is as follows :

" Sec. 4. That a transcript of the record of the case of the District of Columbia against the Metropolitan Railroad Company of the District of Columbia, at Law, No. 22,458, in the Supreme Court of the District of Columbia, together with the original papers and record entries therein, duly certified, shall, by appropriate orders duly entered of record, be transferred and delivered to the Court of Appeals

of the District of Columbia, which said Court of Appeals
is hereby vested with original authority and jurisdiction to
hear and determine said case without a jury, upon the pleas
and issues and proofs therein other than the pleas and
issues relating to the statute of limitations or plea of failure
of notice to said company of any act required of it, and to
determine from and upon said record and pleadings and
proofs therein contained, and such other proof in the course
of said hearing as said court may determine to be necessary
in order to dispose of the case upon its merits, what, if
any, indebtedness is due to the District of Columbia from
the said railroad company in respect of the cause of action
stated in the declaration filed in said case, assuming that
due and proper notice has been given to said company of
all acts required in the premises, and to enter judgment
against said company in favor of the District of Columbia
for any sum or sums of money that said Court of Appeals
shall find due from said company in respect of said cause
of action, for the amount of which said judgment execution
may issue out of said court, and said judgment shall im-
mediately become a lien upon all the property of said com-
pany, to be enforced in the manner now provided by law
for the enforcement of other liens, and shall be paid within
90 days from the date thereof: *Provided,* that unless said
company shall file in said Court of Appeals its consent in
writing to the aforesaid transfer of the said case, and also a
waiver of all its rights and defences under the statute of limi-
tations and from want of notice as hereinbefore provided
for, and also a waiver of all rights, benefits, advantages and
defences that it has or may have by reason of the decision
and judgment of the Supreme Court of the United States
made and entered in said case, within 30 days after the ap-
proval of this act, then all rights granted to said company
by this act shall cease and be determined: *Provided,* that
the judgment of the said Court of Appeals shall be final and
that there shall be no appeal therefrom: *And provided
further,* that the cost of said transfer and of the hearing of

said case in the Court of Appeals shall be paid by said railroad company."

The railroad company complied with the requirements of the proviso of the act, filed its waiver of the defence of the statute of limitations and of the defence of notice, and caused the record to be transmitted to this court. Both parties entered their appearance here. Thereupon, in order to facilitate the determination of the controversy, this court, with the consent or acquiescence of both parties, on June 7, 1895, by an order entered therein on that day, referred the cause to James G. Payne, Esq., as special commissioner of the court, to take such additional testimony as might be desired by either party, and upon such testimony and the other testimony already in the cause, to report to the court the amount of the indebtedness, if any, of the railroad company to the District of Columbia, with such schedules and alternative statements of account as would be proper for the presentation of the matter to the court for its final disposition. The order was in the following terms :

" It appearing to the court that a transcript of the record of the case of The District of Columbia against The Metropolitan Railroad Company, at Law, No. 22,458, in the Supreme Court of the District of Columbia, together with the original papers and record entries therein duly certified, has, by proper orders, duly entered of record, been transferred and delivered to this court in pursuance with the act of Congress, approved August 2, 1894, entitled ' An act to authorize the Metropolitan Railroad Company to change its motive power for the propulsion of the cars of said company,' and it also appearing that additional testimony is necessary in order to enable the court to dispose of the case upon its merits, it is therefore, this 7th day of June, 1895, ordered that said cause be, and the same is hereby, referred to James G. Payne, Esq., who is hereby appointed special commissioner for the purpose, with directions to consider the case on the aforesaid transcript of record and the stenographic report of the testimony adduced at the trial

of the cause in the Supreme Court of the District of Columbia, and such other proof as either party may submit, and report to this court what, if any, indebtedness is due to the District of Columbia from the said railroad company in respect of the cause of action stated in the declaration filed in said case ; and the said special commissioner will submit such schedules and alternative statements of account, if need be, as in his judgment he may think necessary to present said cause to this court for its final disposition, said report to be filed, together with the testimony, on or before October 1 next ; and it is further ordered that said cause be, and the same hereby is, set for hearing on the first Tuesday of November, 1895.

"This order is made without prejudice to any of the rights of the defendant.

"*Per curiam :*                    R. H. ALVEY,
                              "*Chief Justice.*"

The parties appeared by their respective attorneys before the special commissioner, and there they agreed upon a statement of all the substantial facts in the case, except in reference to one or two particulars, which were mainly the character of pavement that was laid by the Board of Public Works and the bad manner in which it was laid ; and in regard to these particulars the railroad company proceeded to adduce testimony, from which the special commissioner drew the conclusion, which is most fully justified, that the pavement in question was, in consequence of bad material and inferior work, unsuitable for the purpose for which it was designed ; and that the railroad company was very soon compelled to repair and replace the whole of it, which it did at its own cost and expense. The agreed statement of facts, the additional testimony adduced by the railroad company before the special commissioner, and the special commissioner's report, constitute the greater part of the record before us. The District of Columbia adduced no further testimony, and contented itself with the agreed statement of facts.

The very lucid and exceedingly satisfactory report of the special commissioner has greatly aided the court in the hearing of the cause and greatly facilitates its determination by us. In and with this report the special commissioner has presented five distinct schedules of the work done by the District of Columbia for which it claims compensation or reimbursement. These schedules are designated as A, B, B², C, and D.

In schedule A is included all the work done on the so-called main line of the railroad company—that is, on Fourteenth street, New York avenue, F street, H street, C street, D street and New Jersey avenue—and it comprises ten items of account, five being for concrete, four for wood, and one for Belgian block. The aggregate of the items is $37,551.61.

In schedule B is included the work done on East Capitol street, First street, and Ninth street ; and it comprises five items of account, three for concrete, and two for wood, aggregating $75,816.40.

In schedule B² is included the work done on Boundary street, between Ninth and Seventh streets ; and it comprises one item for Belgian block, $1,914.52.

In schedule C is included the work done on Seventeenth and P streets—the branches acquired under the charters of the Connecticut Avenue and Park Railroad Company and the Union Railroad Company—and it comprises four items of account, three for concrete and one for wood, aggregating $22,261.90.

In schedule D is included the work done on West, High, Second, and Montgomery streets, in the city of Georgetown, covered by the charter of the Union Railroad Company ; and it comprises six items, one for concrete, four for wood, and one for cobble-stones, aggregating the sum of $15,292.63.

The sum total of all the schedules is $152,837.06, which is the sum claimed by the plaintiff in its original and amended declaration ($162,622.95), less a deduction, admitted be-

fore the special commissioner and on the record, of $9,785.89, allowed for the width of the rails, and which is stated in the account presented to the special commissioner by the District of Columbia, as a deduction proper to be made. A further deduction of $5,330.01, for the value of cobble-stones taken from the railroad company's track and appropriated by the District of Columbia to its own use, was also admitted by the attorney for the District of Columbia before the special commissioner as a proper deduction to be made from its claim, and the special commissioner has so reported. These two deductions reduce the original claim from $162,622.95 to the sum of $147,507.05, which was the amount of the verdict of the jury in the trial in the Supreme Court of the District of Columbia.

The special commissioner reported it as his conclusion on the law and the facts of the case, that the District of Columbia was entitled to recover the amounts set forth in schedule A and schedule B², amounting to $39,466.13, less the value of the cobble-stones referred to, $5,330.01, leaving a net sum of $34,136.12; and that it was not entitled to recover for any of the items in schedules B, C, and D.

To this finding both parties have excepted; the District of Columbia because its whole claim was not allowed, and the Metropolitan Railroad Company in consequence of the allowance that was made. And upon the record as thus made the case now comes before us for final determination.

*Mr. Sidney T. Thomas*, Attorney for the District of Columbia, and *Mr. Andrew B. Duvall*, Assistant Attorney, for the plaintiff:

1. The obligation of the defendant company is to keep its tracks and for a space of two feet beyond the outer rails thereof and also between its tracks, at all times well paved and in good order without expense to the United States or to the city of Washington.

2. The duty of the defendant to keep its tracks at all times well paved and in good order extends to laying a

pavement where one did not exist, and to repaving with a different and improved pavement.

3. The defendant's tracks were to be maintained " subject to the municipal regulations of the city of Washington." It cannot, therefore, be contended with reason that the defendant had the right to designate the kind and mode of pavement in such regulations. In 1871 the Board of Public Works was placed in control of the streets, with admitted discretion to make these " regulations," change grades and pavement, and it was the special duty of the company to conform to grade and pavement and keep the portion of the streets occupied by it well paved and in good order without expense to the District. No other rule can be practicable and secure uniformity. 4 Mackey, 216.

We are not without other authority to support our contention. *State v. Railroad Co.*, 50 Am. and Eng. R. Cas. 179, and cases cited. The charter duties of the defendant in this case are more explicit and broader than in the case above cited. There was no duty to " pave " in express terms in *State v. Railroad Co.*, *supra*, and yet the court held the railroad company was liable to pave the portion of the streets between its tracks and two feet on each side thereof when the city paved the balance of the street. See also *Philadelphia v. Railway Co.*, 169 Pa. St. 269.

4. There is no ambiguity or doubt in the charter of the Metropolitan Railroad Company as to its duty in regard to paving. Nor has the supposed construction by the company and the municipal authorities been contemporaneous or continuous. The railroad company has contended one thing and the municipal authorities another. See *United States v. Graham*, 110 U. S. 221 ; *United States v. Cameron*, 137 U. S. 552 ; *United States v. Alger*, 152 U. S. 397.

The present case is where on default of the railroad company the plaintiff has borne expenses which the company should have borne, and is asking reimbursement. There has been no mistake of law in this case. The mistake of law could only exist in case the District supposed itself

bound to do the work, when in point of law it was not so bound ; but it was so bound, and there was no mistake in acting on that assumption.

5. A street railroad occupies and appropriates the public street when it lays its sleepers and crossties. The defendant's charter authorized it " to construct and lay down a double-track railway." This railway consists of a bed, sleepers, crossties and iron rails. The company had an option, and the time had not expired within which it was required to exercise that option, of occupying and appropriating East Capitol street for railway purposes. When it laid its sleepers and crossties it then exercised its election to occupy—and appropriate—the street under its charter. It is immaterial that it did not in point of fact lay its rails and actually operate the road until a period subsequent. The effect of the defendant's occupation of East Capitol street by exercising its right to lay sleepers and crossties was a *location* of its road, and had the effect of preventing any other street railroad from occupying that street. Its rights in the street then became fixed, and its correlative obligations at once arose. *Railway Company* v. *Alling,* 99 U. S. 475 ; Coymn's Digest, Location C, 2.

It would be manifestly unjust for the defendant, as against the public, by the same act to obtain the benefit of its location and at the same time escape the burdens attaching thereto. The real character of the transaction is to be regarded in determining this question. *State* v. *Railroad Co.,* 21 Minn. 472 ; *State* v. *Railroad Co.,* 21 Minn. 344.

A railroad is practically one structure ; and in enforcing the lien of mechanics under the mechanics' lien law the Supreme Court of the United States has held the entire road subject to a lien for work done on one section, though the road was built in sections. *Brooks* v. *Railway Co.,* 101 U. S. 443 ; *Meyer* v. *Hornby,* 101 U. S. 728.

6. The duty imposed upon a street railway company of paving its tracks and for two feet beyond the outer rails thereof, is just and is not an arbitrary one.

*Mr. W. D. Davidge* and *Mr. Nathaniel Wilson* for the defendant :

1. In respect of the streets and avenues mentioned in schedule A, the defendant having, as admitted, kept well paved and in good order its tracks, and for the space of two feet beyond the outer rails, and also the space between the tracks, its duty was performed, and hence it is not liable for the part of the cost of the pavements laid by the plaintiff in the said spaces.

As the measure of duty was to keep in fact well paved and in good order, the defendant necessarily had the right to select the material for the pavement. Its duty was discharged, if, whatever the material, the spaces mentioned were in fact kept as required.

The duty, as defined, being absolutely free from doubt, it matters not what considerations controlled Congress in its action. It is sufficient that the law-giver, in the exercise of its discretion, acted as it did. It is not difficult, however, to determine the main consideration. A properly constructed railroad required, or might require, for the portion of the street or avenue dedicated to railroad purposes, a very different pavement from the rest of the highway, and hence the propriety of imposing the duty on the defendant and leaving it to select the material best adapted to the purpose, instead of turning over the duty to pave such portion, as well as the rest of the highway, to a petty municipal corporation.

That the duty of the defendant was as herein contended, a duty depending for its performance upon the fact that the said spaces were kept well paved and in good order, and not upon the will or discretion of the plaintiff, is moreover shown by the conduct of the parties. Such conduct is a practical interpretation of the duty, and entitled to great, if not controlling, influence. *Chicago* v. *Sheldon*, 9 Wall. 50, 54.

A charter like that of the defendant is a contract between

the government and the grantee, and the duties prescribed, whatever they may be, are part of the consideration of the contract. This much is settled beyond dispute. *Dartmouth College* v. *Woodward*, 4 Wheat. 518. It is true that the right to repeal and amend the charter was reserved, but the charter is none the less a contract repealable or amendable at the will of Congress. It can not be pretended that such right was or could be delegated by Congress to the plaintiff.

It is impossible to understand how a duty to change the railroad so as to make it *conform* to the grade and pavement can be made to involve a duty to do more than *change* the railroad or to involve the duty to pave, when confessedly the railroad is not to be *changed and is left as before*.

2. The defendant not having constructed its railroad in the streets and avenues mentioned in schedule B, schedule B², schedule C, and schedule D, when the alleged order or direction was given, is not liable for the part of the cost claimed by the plaintiff for the pavements in said streets and avenues.

3. The defendant, by laying its stringers and crossties in the streets and avenues mentioned in schedule B and schedule C, under an agreement with the Board of Public Works that if the defendant would, in the progress of laying the pavements in the streets and avenues, lay its stringers and crossties, and thereby prevent the necessity of tearing up the streets and avenues in the future when the defendant might elect to construct its railroad, the laying of such crossties and stringers should not involve any liability of the defendant to pay for any part of the said pavements, but that the defendant should stand in respect of liability as if the said crossties and stringers had not been laid, did not make the defendant liable to the plaintiff for the cost of paving said streets and avenues claimed in this action.

4. If the work described in the declaration had been lawfully done and paid for by the Board of Public Works, there would still be no obligation on the part of the defendant to

pay the cost of the work, because the Board of Public Works, in the administration and practical execution of the act of Congress of February, 1871, and of the act of Assembly of July, 1871, and of the laws relating to the duties and obligations of the defendant, construed those laws to mean, and determined that they did mean, that the right and duty to pave and repave the spaces described in the declaration at whatever time and with whatever materials the Board of Public Works might select, belonged to and devolved exclusively upon the Board of Public Works and not upon the defendant, and the plaintiff is bound by the interpretation then given by the municipality to its own powers and to the laws which created and governed them.   *Chicago v. Sheldon,* 9 Wall. 54 ; Cooley Const. Lim. 69 ; *United States v. Railroad Co.,* 98 U. S. 334 ; *Schell v. Fauche,* 138 U. S. 562 ; *Roberts v. Downing,* 127 U. S. 613 ; *Hastings v. Whitney,* 132 U. S. 357 ; *United States v. Railroad Co.,* 142 U. S. 621.

5. The act of Congress of June 20, 1874 (18 Stat. 119), which abolished the Board of Public Works and created a Board of Audit, and directed it to ascertain what was justly and equitably due from the street railway companies in respect of paving done by the Board of Public Works, was a statute *in pari materia* with the aforementioned acts of 1871, and with the defendant's charter, and expressed the finding by Congress that the defendant was not liable under its charter for the cost of the pavements laid by the Board of Public Works, and created a special tribunal to which the subject-matter of the defendant's just and equitable liabilities to the plaintiff in respect of paving was committed.

It is a familiar rule that statutes which relate to the same subject-matter should be construed together and effect be given to them all, although they contain no reference to each other and were passed at different times.   *Vane v. Newcombe,* 132 U. S. 220, and cases cited ; Am. & Eng. Enc. of Law, vol. 23, p. 315.

6. The act of Congress, approved June 11, 1878, pro-

viding a permanent form of government for the District, covering the entire subject of the obligations and rights of the defendant in respect of laying and paying for pavements in, between and exterior to its tracks, is a statute *in pari materia* with the act of June 20, 1874, and with the acts of 1887, and with the defendant's charter, and gave a legislative interpretation to prior legislation.

7. The act of Congress of June 19, 1878, and that of June 27, 1879, relative to the revision of assessments, gave to the District authorities no right to make any charge or to create any new claim against the defendant for paving or for the cost of paving done by the Board of Public Works. These acts *ratified* and *confirmed* the assessments previously made, including those made against the District and abutting property owners, for the paving in the spaces described in the declaration, and in all other cases, except in those where complaints by owners of abutting property were made in the manner and within the time prescribed by the acts.

Mr. Justice Morris delivered the opinion of the Court:

1. By concession of counsel for the District of Columbia in open court in the hearing before us, it now appears that the claim of the District to the items in schedule D, for work in Georgetown amounting to $15,292.63, is without foundation; and that this sum in any event must be deducted from the demand of the District, which is thus reduced to the sum of $132,214.42. The work done on the streets of Georgetown specified in this schedule had been done before the railroad company had begun to occupy these streets in any manner; and when it did occupy them, it repaired the streets at its own expense, and continued to keep them thereafter in good order and condition. The claim of the District in this instance was wholly erroneous and is so shown by the record; and the attorney for the District could scarcely do otherwise than abandon these items.

2. On the other hand, the item of $1,914.52, in schedule B², for work done on Boundary street, is scarcely open to

discussion.  That work was done in the summer of 1875, after the railroad company had fully occupied the street and was running its cars thereon ; and the material used for paving, which was Belgian block, was well suited for the purposes of the company, and a durable pavement.  And this sum of $1,914.52 must, therefore, be adjudged in favor of the District of Columbia in any event.

3.  With reference to the items contained in schedules B and C, both of which stand upon the same basis, it appears that while the railroad company under its charter had the right of constructing its branch lines of road upon the streets therein mentioned, it had not in any manner exercised that right when the Board of Public Works entered upon those streets and undertook to lay the pavements with part of the cost of which it is now sought to charge the railroad company.  The company had still about two years in one case and nearly three years in the other within which to construct these lines ; and it is alleged, and it may be assumed to have been the fact, that its resources at the time were unequal to the expenditure that would be entailed by the work of construction.  In this condition of things the president of the railroad company addressed, on October 26, 1871, the following communication to the Board of Public Works :

"WASHINGTON, October 26, 1871.

"To the Hon. Board of Public Works of the District of
    Columbia.

"GENTLEMEN : Your board having recently ordered the paving of certain streets through which Congress had given this company permission to lay rails whereon to run street cars, we would respectfully ask the privilege to lay down the sleepers and crossties as the paving progresses, thereby preserving the streets and avenues from being cut up at a future day in the execution of this work.  It is the intention of this company to extend the Metropolitan Railroad westward from its present terminus to Georgetown and eastward to Uniontown, and also to lay tracks on Ninth street

to Pennsylvania avenue, to the Boundary, and on 4½ street from the city hall to the arsenal gate as soon as the property holders along these lines subscribe to additional stock, which, it is hoped, will be done shortly. The company are willing, with the permission of the board, to go on at once and lay the timbers for these lines, fully preparing them for the rails to be put in at some future time. To keep a well-laid pavement in good order it is desirable to avoid all excavation, particularly in the center of the street. This consideration doubtless influenced your board in its wise precaution of ordering all water, gas, and service pipes to be laid prior to the paving. The necessity is more apparent. where railroad privileges have been granted, to have the timbers laid as the paving progresses, which will not only be a benefit to the city, but add to the comfort of those residing upon or passing over the street. We are willing to anticipate the putting down of the sleepers and crossties of our contemplated extensions, provided the paving be done by your own contractor without charge against us, and should be pleased if the suggestion herein submitted should meet the favor of your board.

    " Very respectfully, your obedient servant,

        " J. W. THOMPSON, *President.*"

The answer of the Board of Public Works to this communication would seem to have been the passage by it on the same day (October 26, 1871,) of the following resolution :

" Resolved, That when this board shall have authorized the paving of a roadway of any street or avenue along which any horse railroad company is empowered to lay railroad tracks, such company shall have the privilege of laying, at its own expense, the sleepers, crossties, and other woodwork of such tracks in advance of paving, so as to prepare the track for the rails and thus prevent the necessity of disturbing the pavement for this purpose at a future time ; said work to be done under the direction of the board."

In pursuance of this resolution, and of the understanding created thereby, the railroad company at its own expense laid the sleepers and crossties on Ninth street and East Capitol street, while the pavements were being laid by the Board of Public Works; but it did not lay its rails or begin the running of its cars until some time after the laying of the pavements had been completed. How long this was does not appear from the record before us.

Substantially the same conditions prevailed and the same action was taken with regard to Seventeenth street, between H and I streets, and Connecticut avenue, which are the subject of schedule C.

The liability, therefore, of the railroad company to the District of Columbia, in regard to the items contained in these two schedules B and C, depends upon the determination of the question, whether by laying down its sleepers and crossties under this resolution adopted by the Board of Public Works, the railroad company immediately thereupon so occupied the streets and avenues upon which it had been authorized to construct its road, as to become liable to the District of Columbia for the cost of paving then done by the board on the portion of the streets and avenues thereafter used by the railroad company. This question we must answer in the negative.

Evidently it was not the understanding or intention of the Board of Public Works at that time to order the paving of any portion of these streets or avenues to be done by the railroad company. Nor was it the intention to charge the railroad company with any portion of the cost; for no charge therefor was ever made by the board against the company. And so far as the understanding of all the parties at the time can avail in the consideration of the question, it is beyond all doubt that the railroad company was not supposed to have incurred, by the action which it took, any liability whatever on account of the paving.

The arrangement suggested by the letter of the president of the railroad company, to which evidently the resolution

adopted by the Board of Public Works was intended as a reply—although the resolution properly provided that the arrangement should be general and should apply to all proposed railroads, and not alone to the defendant in this case —was an arrangement certainly beneficial to the public as well as to all the parties in interest.   If it were a cunningly devised scheme to enable the railroad company to evade the duties and liabilities imposed upon it by its charter, a different case might be presented here.   But there is no pretence of bad faith on the part of the railroad company or of any one else in this connection.   The street railroad business was in its infancy at the time.   Its success was not assured. The defendant, it is conceded, was without present resources to construct the proposed branch lines.   It did not propose to construct them at that time ; and it had by law the right to postpone their construction for a further period.   It had the unquestionable right, if it had chosen to exercise it, to remain silent, to let the Board of Public Works proceed with its work of paving, to wait until that work was done, and then to enter upon the streets, construct its road and gain the benefit of the paving that had been done by the board without any liability to pay for it.   Even if it could be conclusively shown that the railroad company had so postponed all action by it under its charter, for the express purpose, secret or avowed, of availing itself of the intermediate labors of the public authorities, it is not apparent how, under the law, it could be held liable for the cost of those labors.   Its charter does not require it to pay for any pavements already laid upon any of the streets upon which it is authorized to enter.   That charter merely requires it to keep the spaces occupied by it in those streets well paved and in good order ; and that requirement would involve the necessity of laying a new pavement, if none were already there ; but it certainly does not involve liability to pay for a pavement already in existence.   Had Congress intended to impose such liability upon the company it could easily have said so ; and it might have been proper to do

so.    But neither in the charter nor anywhere else has it said anything that could by any possibility be construed to involve such a liability, and we do not understand that any such liability is claimed by anyone in behalf of the plaintiff in this case.

The claim is that the laying of the sleepers and crossties by the railroad company in advance of the work of paving by the Board of Public Works or simultaneously with it, was such an appropriation of the streets by the railroad company to its own use as to constitute, in contemplation of law, a construction of its railroad upon the streets in question, so as thereby to render it liable under the statute for the cost of the pavement.    But this we must regard as an unreasonable application of the statute.    The reason of the law demands no such construction ; and we do not think that the language of the law justifies it.

The laying of sleepers and crossties in a street, whereon afterwards to construct a railroad, does not of itself appreciably diminish the use of the street by the public ; nor does it appreciably increase the wear and tear of the roadway.    The crossties are usually buried out of sight, and form merely a substratum that would not affect the ordinary uses of the street in any way ; and the sleepers are usually laid even with the surface of the street, and do not of themselves impede travel or interfere with the use of the street by the general public.    It is the use of the street by the railroad company with its horses and carriages and its superior right of way for its horses and carriages along its line of tracks that restricts the public use and subjects the street to the wear and tear that justifies the requirement in the charter which provides that the company should bear the expense of keeping well paved and in good repair the portion of the street so devoted to its franchises.    And while it is true that, for some purposes, the act of occupation should be construed to begin with the first beginning of the work of construction, and from the very first moment at which the railroad company enters upon the street, yet a partial and

disconnected act, not understood or intended by anyone to be an act of definite and permanent appropriation, should not be given that effect when there is no public purpose to be subserved by it, and when the express intention of all the parties was to the contrary.   When it is remembered that by simply waiting until the work was done, the railroad company could have had the benefit of that work, and at the same time could have escaped liability for its cost, it is difficult to see why, in the absence of any express provision of law to that effect, there could have been illegality in an arrangement of which the purpose and the necessary result was to save expense, inconvenience and annoyance to the public.   And assuredly it is no objection to the arrangement in this regard that it ultimately also saved expense to the railroad company.

The Board of Public Works, as is clear from the statute, and as has frequently been held, had entire charge and control of the matter of paving the streets and avenues of the city of Washington.   For the purpose of paving it could and did use wood and other materials.   And if wooden beams were fit for a portion of the street, and some one was willing to put down such beams without expense to the public, it is difficult in reason to see why the public or the District of Columbia might not lawfully accept the gift.   It was not proposed at the time to make any other use of these beams.   For the time they were wholly and exclusively for the benefit of the public.   And it does not alter the case at all that afterwards iron rails could and would be attached to them, and that thereupon the whole structure would be subjected to a special use, different from the public use.   It is plain that, under the circumstances, it is this attachment of iron rails and the special use thereafter made of the structure that constitutes, for present purposes, the appropriation of the street by the railroad company.

That this was the intention also of Congress is quite apparent from the language of the statute itself.   For the requirement of the statute is that the railroad company should

" keep said tracks and for the space of two feet beyond the outer rail thereof, and also the space between the tracks, at all times well paved and in good order." Until there are tracks and an outer rail, it is not apparent how there can be anything to be kept well paved and in good order. The duty of paving or of keeping the specified spaces well paved and in good order evidently does not arise until the rails are laid and the structure becomes a railroad track. As we have said, if Congress had intended that railroad companies receiving the privilege of constructing and operating their lines of railroad in the city of Washington should not exercise that privilege without paying for the cost of pavements which thereby became devoted to their use, it could easily have said so; and there would certainly be no great injustice in the requirement. But it has not thought proper to say so, and the courts cannot add a liability which the law does not impose.

We desire to repeat that we do not mean to say that there may not be liability on the part of the railroad company from the first moment that it enters upon a street in any manner. If it put down only one sleeper or one crosstie, or only displaced one shovelful of earth, and damage resulted to some one from negligence connected with the act, the company would undoubtedly be liable to the person so injured. And so of other cases that may readily be conceived. What we hold here is that, under the acts of Congress which constitute the charter of this defendant railroad company, the duty of paving or of keeping the spaces allotted to it well paved and in good condition, does not arise until there are rails laid and a track constructed— not necessarily all the rails laid or the entire track constructed, but some appreciable space of rail and track in respect of which the duty may arise.

The decisions cited in this connection by counsel on behalf of the District of Columbia we cannot regard as in any manner contravening this position. The case of *Railway Co. v. Alling,* 99 U. S. 475, is cited to show that, when

a railroad has been definitely located, the title to lands granted to it, previously imperfect, thereupon becomes definite and specific.   The case of *State* v. *Winona*, 21 Minn. 472, and *State* v. *Southern Minn. Railway Co.*, 21 Minn. 344, are referred to for the purpose of showing that, with a view to the taxation of property, a contract to convey is to be regarded as the equivalent of a conveyance. And *Brooks* v. *Railway Co.*, 101 U. S. 443, and *Meyer* v. *Hornby*, 101 U. S. 728, are cited to show that a railroad, although constructed in sections, is practically one structure for the purpose of the enforcement of a mechanic's lien claim for work done on one of the sections.   And no doubt numerous other cases of a similar character might be cited.   But we fail to see their application to the question before us.   The gist of all these cases is that, when one has the beneficial use of property, he should be liable for its burdens—a most just and equitable doctrine.   But this does not tend to show that one should become liable for such burdens before he becomes entitled to the beneficial use of the property.

Sleepers and crossties do not constitute a railroad.   Indeed, we might conceive a railroad without them.   It is the imposition of rails upon the substructure that constitutes the definite character of a roadway as a railroad.   And it is only when a railroad company has the definite use of a railroad that it becomes its duty to keep that roadway paved. It may have antecedent duties, but those duties are of a different character.

We concur with the special commissioner in holding that, in respect of the items charged in schedules B and C of his report, the plaintiff is not entitled to recover anything from the defendant.

4. With regard to the plaintiff's claim as set forth in schedule A of the report of the special commissioner, another and a very different question is presented.

That schedule comprises the work done on the streets and avenues of the city of Washington whereon the main

line of the defendant's road had been constructed and on which the road had been in actual operation for several years before the Board of Public Works commenced its plan of improvement. On these streets and avenues, on some or all of which there had been no previous pavement of any kind, the railroad company had paved its entire track and all the spaces prescribed for it by the statute in a good and substantial manner, with a pavement of cobblestones well suited to its purposes and entirely satisfactory to the authorities of the city of Washington and of the District of Columbia. The Board of Public Works resolved and undertook to pave all these streets with concrete or wood, one space only with Belgian block. Entirely ignoring the railroad company and the existence of the railroad tracks, it entered into contracts for paving the whole roadway from curb to curb, and made no allowance even for the spaces actually occupied by the rails, although in the aggregate these spaces amounted to a very considerable sum. And it may be noted here, that, in the demand made in 1880 by the District of Columbia upon the railroad company and in the declaration filed in this suit, the charge made against the railroad company included the supposed cost of work which was never done and could not have been done, the paving of the spaces occupied by the rails of the company's railroad, amounting in the aggregate to the sum of $9,785.89. But, as already stated, this is now conceded and allowed to be a proper deduction from the amount of the claim.

Against the protest of the railroad company, the Board of Public Works, by its contractors, proceeded to remove the cobble-stone pavement laid by the railroad company; appropriated the cobble-stones to the use of the District, without, in the first instance, giving any credit for the value thereof to the railroad company, although the credit is now conceded, amounting to $5,330.01; and laid what proved to be a worthless pavement of wood and concrete, which soon rotted or crumbled and became dangerous to the

horses, and which in a short time the railroad company found itself compelled to remove, which it did with the acquiescence of the authorities of the District of Columbia, replacing it at its own expense with a new cobble-stone pavement. It is this worthless pavement, so laid, for which compensation is here sought by the District of Columbia from the railroad company.

Upon this statement of facts, which are undisputed and beyond dispute, if this were a controversy between two private corporations, or between two private individuals, or between a private corporation and a private individual, and the controversy were to be determined on principles of equity and justice, there could scarcely be much hesitation as to what the decision should be. But there are other and most potential considerations in this case that cannot be ignored.

We are dealing in a measure with the sovereign power of the State. The District of Columbia, it is true, is only a corporation; it is not the State; and the Board of Public Works was only a subordinate, although very powerful, agency within the corporate administration. And the District of Columbia, as determined in this very case by the Supreme Court of the United States, is not entitled even to immunity from the bar of the statute of limitations. But it is nevertheless a municipal corporation, armed with one of the most formidable powers and attributes of sovereignty, the power of taxation, and charged by the sovereign power as its representative with the control and proper maintenance of the public highways. Over these public highways its control from the State is supreme; and all other agencies are subordinate to it. When Congress permitted and authorized the defendant railroad company, a purely private corporation, although subserving a public purpose and to be regarded perhaps as performing a public function, to appropriate to itself to a limited extent a portion of the public highway, and in consideration of that privilege required it to keep such portion of the highway well paved and in

good repair, it did not mean to relieve the city of Washington or the District of Columbia, as a municipal corporation, from the performance of the superior duty in the same respect imposed by law upon the municipality. There was undoubtedly a duty imposed by the sovereign upon the railroad company ; there was a superior duty imposed upon the municipality and a superior power granted to it. The municipality is the immediate representative of the sovereignty ; the railroad company is no more than an inhabitant of the municipality, subject, like all other inhabitants, to the municipal ordinances, and by the special provision of the law in this case, subject as to all the use and maintenance of its road to all the municipal regulations.

The city of Washington had been authorized and required " to open and keep in repair the streets and avenues " of the city (Act of May 15, 1820, 3 Stat. 583). Under the so-called territorial organization, the Legislative Assembly of the District of Columbia, which was no more than the municipal council of the District, was given " the care and charge of and the exclusive jurisdiction over all the public roads " of the District (Act of Feb. 21, 1871, 16 Stat. 420). And by the same act it was given to the Board of Public Works " to have entire control of and make all regulations which they shall deem necessary for keeping in repair the streets, avenues, alleys and sewers of the city."

In view of this legislation it can scarcely be supposed that, when Congress in its grant to the railroad company required that organization to keep the portion of the street occupied by it well paved and in good repair, it intended thereby to withdraw such portion of the street from the control and jurisdiction of the municipality, and commit that control exclusively to the railroad company. Beyond all question, the intention of Congress was to require the railroad company to perform the duty imposed upon it under the superintendence and subject to the control of the municipality. No one supposes that, if the railroad company failed to perform its duty and permitted the spaces

occupied by the tracks to be in bad repair, and injury ac-crued therefrom to any one, the municipality would be re-lieved from liability.

It is scarcely, if at all, controverted on behalf of the de-fendant that the railroad company is subject to municipal regulation in this matter of paving as well as in all other matters that are proper subjects of municipal ordinance. We regard it as clear under the law, that, if the railroad company has failed to perform its duty properly, has im-properly or defectively laid down its pavement, or has per-mitted that pavement to be out of repair, it is the duty of the municipality, under its paramount grant of power, to compel the performance of the duty, and to require the pavement to be kept in good order and condition. And if the municipality may by regulation require and compel the railroad company to perform its duty in that regard, it certainly may, under the broad power of "*entire control,*" given to it, perform that duty itself, if the railroad company fails to do it, and charge the cost to the railroad company. This we understand, indeed, not to be denied by counsel for the defendant. The contention, as we understand it, is not that the municipality may not regulate the operations of the defendant, but that it may not change its duty ; and the argument then is, or would seem to be, that by requir-ing the defendant to change the pavement of its tracks so as to conform in character to the pavement of the re-mainder of the street, the municipality changes the duty of the railroad company and imposes a duty upon it different from that imposed by Congress.

We are not convinced by this argument. A change of pavement is not a change of duty. It is common expe-rience that, in the progress of civilization and refinement, municipal methods that were once satisfactory become wholly insufficient. The old style of cobble-stone pave-ment, which was once universal and a remarkable improve-ment over earth and mud, would now be regarded, at least in Washington, as intolerable. Municipalities should keep

pace with the civilization of the age and the progressive wants of their communities. It is no reason, because one class of pavement was once deemed entirely satisfactory, that it should not be replaced from time to time with others shown or supposed to have superior advantages. It is well-settled law that a municipality, having general control over its streets and avenues, may alter their grades at will, may replace one pavement with another as often as it deems expedient, and may impose successive impositions of taxes therefor. *Smith* v. *Corp. of Washington*, 20 How. 135; *Gosslcr* v. *Georgetown*, 6 Wheat. 593; Dillon on Mun. Corp., secs. 685, 686 and notes. Indeed, this right to alter the grades of the streets and to provide for successive repavements thereof is distinctly recognized and authorized by Congress in the act chartering the Metropolitan Railroad Company as proper to be exercised by the corporate authorities of the District of Columbia; for section 5 of that act, already cited, provides in express terms " that nothing in this act shall prevent the Government at any time at their option from altering the grade or otherwise improving all avenues and streets occupied by said roads, or the city of Washington from so altering or improving such streets and avenues, and the sewerage thereof, as may be under their respective authority and control; and in such event it shall be the duty of said company to change their said railroad so as to conform to such grade and pavement."

It is for the municipality then to determine what grades it will establish for the streets, what pavements it will lay, and what changes, if any, it will make from time to time in those grades and pavements; and it is specifically made the duty of the railroad company to conform thereto. The power of the municipality does not extend merely to the portion of the highway not occupied by the railroad; for entire control over the whole area of the highway is given to it; and the conformity required from the railroad company is necessarily conformity to the and direction of order the municipality, subject of course to an appeal by the railroad com-

pany to Congress for a limitation of what might prove to be municipal oppression, or to the courts for abuse of municipal discretion.   In section 5 above cited conformity is required from the railroad company, not only to any new grade which the municipality might establish, but likewise to any new pavement which the municipality might direct as proper for the street.   The word *pavement* is there introduced for the first time in the act ; but it is clear that it was included in the term *improving* previously used ; and there is no possibility of mistaking the intention and meaning of Congress in the matter.   It cannot be that Congress proposed that, when the railroad company once put down a cobble-stone pavement, entirely satisfactory though it was at the time to every one, the status of the company in respect of that pavement was thereafter beyond municipal control, and no development of improved methods could operate to require the substitution therefor of any other pavement.   It was well said by the Supreme Court of Pennsylvania in the case of *Philadelphia* v. *Ridge Ave. Railroad Co.*, 143 Pa. 444, 471, with reference to a similar condition of things occurring in the city of Philadelphia :

   " The duties specified in the (company's) charter were imposed with reference to the changes and improved methods of street paving which experience might sanction as superior to and more economical than old methods.   In other words, the company is bound to keep pace with the progress of the age in which it continues to exercise its corporate functions.   The city authorities have just as much right to require it to repave at its own expense with a new, better, and more expensive kind of pavement as they have to cause other streets to be repaved in like manner at the public expense."

   It may be, that, under a duty merely to repair, or to keep in good order, no obligation would exist to repave with a new and different material.   *Chicago* v. *Sheldon*, 9 Wall. 50 ; *Baltimore* v. *Scharf*, 54 Md. 499, 525 ; *State* v. *Corrigan Con. St. Railway Co.*, 85 Mo. 263) ; although there are de-

cisions to the contrary (*Philadelphia* v. *City Pass. Railway Co.,* 169 Pa. St. 269; *State* v. *Jacksonville St. Railway Co.,* 5 Am. & Eng. Railway Cases, 179); but no such limitation or construction can apply where absolute conformity to altered pavements is peremptorily required superimposed upon a duty to keep the spaces well paved.

We are constrained to conclude that it was within the statutory power and right of the Board of Public Works in this instance to require the defendant railroad company to substitute on the prescribed spaces, instead of the cobblestone pavement then in existence, the new pavement directed to be laid on the remainder of the highway; and upon the failure of the company so to do, after due notice to it, to put down the pavement itself by its own contractors and to charge the cost to the railroad company. See *W. & G. Railroad Co.* v. *District of Columbia,* 108 U. S. 522.

It would appear that, in fact, no notice was given to the railroad company and no opportunity afforded it to do the work itself. But the element of notice is eliminated from our consideration in this case by the act of Congress and the consent of the railroad company to the provisions of that act, which requires us to assume " that due and proper notice has been given to said company of all acts required in the premises." As, therefore, it is to be assumed that notice was given to the company to do this work, and as it confessedly did not do the work, the right of the Board of Public Works to do it at the cost of the company necessarily follows—provided that it was a work which could properly have been required from the company; and this we have determined.

Undoubtedly and beyond all question, the railroad company was right and the Board of Public Works was wrong in its judgment in regard to the relative merits and suitableness of the two pavements. But this was not the only error committed by the Board of Public Works in its brief, though phenomenal, career of extravagance. The public at large, greatly more than this railroad company, suffered from

the results of its recklessness, which necessitated its speedy abolition by the power which created it.   Yet the railroad company cannot, any more than private citizens, be relieved from the burden of taxation entailed upon the entire community by its mistaken action.   It is well settled law that a municipality is not liable for an error of judgment on the part of its agents. *Johnston* v. *District of Columbia*, 118 U. S. 19; Dillon on Mun. Corp., sec. 948, and notes, and cases there cited.   And from this it follows necessarily that its rights cannot be impaired by any such error of judgment. It does not cease to be responsible for the cost of a pavement because its agents have mistakenly selected one of inferior character.   It does not lose its power of taxation therefor, because the worthlessness of the pavement happens afterwards to be demonstrated.   The railroad company in this instance stands in no better position than the private citizen.   The latter has contributed to the expense of these worthless pavements through the medium of general taxation; citizens, whose property was located along the line of supposed improvement, have been compelled by special assessment to contribute more than their share of the general burden; and the railroad company, which voluntarily by its charter assumed the duty of paving the portion of the highway occupied by its tracks and voluntarily assumed the risk, as we have held it did, of being subject to the direction of the municipality and of its agents in that regard, cannot stand in any better position.   Its case appears to be a case of hardship; but it is not substantially different, or at all different in principle, from that of the rest of the community.

It is objected further, on the part of the defendant, that the streets involved in this controversy had never been authorized by the Legislative Assembly to be improved, and that therefore the proceedings of the Board of Public Works in regard to them were all null and void.   There is force in this argument, and as an original proposition it might be admitted to be true.   So far as this record shows, there was a taint of illegality in all the operations of the Board of

Public Works.   But these operations, so far as they could be the source of resultant right and resultant liability, Congress has so frequently recognized that without here entering into detailed examination of the legislation on the subject, we must hold them to have been validated, to the same extent as though they had been authorized in the first instance.   *Mattingly* v. *District of Columbia*, 97 U. S. 687.

We must conclude, therefore, that in respect of the items mentioned in schedule A, the District of Columbia is entitled to recover from the defendant, the Metropolitan Railroad Company, the amount thereof, namely, the sum of $37,551.61.

5. And the result of the whole is, that we find to be due from the defendant, the Metropolitan Railroad Company, to the plaintiff, the District of Columbia, the amount of schedule A, being the sum of $37,551.61, and the amount of schedule B², being the sum of $1,914.52, constituting the aggregate sum of $39,466.13; from which there is to be deducted the sum of $5,330.01, being the value of the cobble-stones belonging to the railroad company, conceded to have been taken and appropriated by the District of Columbia to its own use.   *The net remainder is the sum of thirty-four thousand one hundred and thirty-six dollars and twelve cents ($34,136.12), for which sum, with interest thereon from November 27, 1880, the date of the institution of this suit, judgment will be entered in favor of the plaintiff, the District of Columbia, with costs, as provided by the act of Congress referring the cause to this court.   And it is so ordered.*

Mr. Justice SHEPARD dissenting

Disagreeing with my brothers on some only of the questions involved in this case, which, however, seriously affect the amount of the judgment to be pronounced, I am compelled to go beyond a mere expression of dissent in order that my views may not be misunderstood.   I concur in their conclusion that the defendant is justly liable for the sums set forth in schedules A and B², amounting, after de-

ducting the agreed credit, to the sum of $34,136.12; and indorse the propriety of the disclaimer made by the counsel for the District in respect of the claim of $15,292.63, stated in schedule D.   Our differences are in respect of defendant's liability for the greater part of the entire amount in controversy, that is comprised in schedules B and C, amounting to the principal sum of $98,078.30.   Those schedules, it will be remembered, comprise all the charges made for paving done on streets not at the time in use by the defendant, where, under permission of the Board of Public Works, it laid its crossties and sleepers as the paving progressed, following with its rails and business use of the tracks later.

Before discussing the questions of strict law upon which, in my opinion, the liability of the defendant depends, I will review, to some extent, the history of these claims and the proceedings in respect of their collection, taking a somewhat wider range than may be necessary because of the supposed equities urged by counsel on behalf of the defendant, and the hardships that have been visited upon it, which, stated at some length in the opinion of my brothers (though not by way of foundation for their conclusion), seem to have had some influence upon them.

One of the contentions of the defendant was founded in the practical construction that had been given the charters of the defendant and the other corporations which it absorbed, by the Board of Public Works, in omitting to assess any of the cost of paving, with one exception, noted later, against the defendant, and it was also contended, upon the strength of an excerpt from the report of the Board of Audit, which will also be referred to again later, that the same view had been taken by that board and subsequently acquiesced in by Congress.   Whilst not sustaining that ground of defence, which applied with more force to the claims in schedule A than to these, my brothers have, nevertheless, referred thereto, and with some slight criticism, implied rather than express, upon the action of the District

authorities in bringing this suit without waiting for the action in the matter that had been invoked of Congress.

In the light of the severe, but just, criticism that the Board of Public Works has received in the argument of counsel for defendant, and in the opinion of the court, for its arbitrary and illegal conduct throughout its administration of affairs, I am justified in regarding its construction of the obligations of the defendant as entitled to no weight whatever. But as I read the record, at no time since the abolition of that board has there been any acquiescence whatever in the exemption from liability claimed by the defendant from the charge for its proportion of the paving done on all the streets which it occupied. There was confusion of counsel and of action in respect of the manner of maintaining and fixing the charge, and there was inaction by Congress ; but there was nothing more. The claim was constantly and persistently made, in one form or another, as I shall show. It should be remembered, too, in considering the hardships of defendant's situation, and any equities that may arise thereon on account of the arbitrary conduct of the Board of Public Works and its grievous mistakes in the matter of worthless wooden and concrete pavements, that Congress finally ratified their acts in general and validated their assessments upon abutting property owners who were compelled by the judgment of the highest court in the land to pay the same. *Mattingly* v. *District of Columbia*, 97 U. S. 687, 692. Recognizing the paramount authority of Congress in the premises, the court was constrained to say : " It may be that the burden laid upon the property of the complainants is onerous. Special assessments for special *road or street improvements very often are oppressive.* But that the legislative power may authorize them, and may direct them to be made in proportion to the frontage, area, or market value of the adjoining property, at its discretion, is, under the decisions, no longer an open question."

During the term of the provisional government that succeeded the one in power during the time of the improve-

ments, and in the early days of the present government, controversies arose with the defendant and other railroad companies touching every point of the claims and there were conflicts also in the opinions of succeeding counsel for the District, as stated in the opinion of the court.    When it abolished the old government, Congress created the Board of Audit to examine into the financial condition of the District, which it found a work of great difficulty on account of the manner in which the books, accounts, and records had been kept.    When the Board of Audit made its first report, on February 15, 1875, there had not been time to make up a complete statement, and the report so shows. In addition to its general report, the board gave, for the information of Congress, an interesting statement of the nature of the grounds of the claims against the railroad companies for paving and of their defences against them. On account of the prevailing conditions and confusion, the report suggested that action be had in the matter by act of Congress.    A brief quotation from the report, on this point, is made in the defendant's argument, which, taken by itself, might possibly be misleading.    Instead, however, of the report casting any doubt upon the justice of the claims of the District, it plainly shows that the Board of Audit not only considered the defendant liable, as claimed, but also as equitably chargeable with extra expense incurred in grading and paving on account of the impediments of the tracks —a conclusion the principle of which was afterwards expressly approved by the Supreme Court of the United States in *W. & G. R. Co.* v. *District of Columbia*, 108 U. S. 522.

Other and distinct equitable claims are made in addition. The report shows, as to these, that notwithstanding the acts of incorporation provide that " said roads shall be deemed real estate, and they, together with other real property, and the personal property of said body corporate, shall be liable to taxation as other real estate and personal property in the cities aforesaid," nothing has ever been collected thereon. The report proceeds as follows:

" The collector of the District reports that for the fiscal year ending June 30, 1872, the Washington and Georgetown Railroad was assessed a tax of $4,570 upon their road under this provision, and the Metropolitan road a tax of $1,275.   For the next fiscal year no tax of this character was assessed against the Washington and Georgetown road, but a tax of $1,275 was assessed against the Metropolitan. No other assessment was subsequently made against any of the roads.   These taxes have not been paid, and so far as the examination has been made, no such assessment has ever been paid by either.  Subsequent to the assessment for 1873, the roads would seem to have brought the question before the board of appeals, and that board decided that the roads were not to be deemed real estate, but personal property, and, as such, exempt from tax under the District law."

The report also refers to the provision requiring the roads to change their grades so as to conform to alterations that might be made, from time to time, and says :

" But an examination of the accounts shows that the District has itself paid for all the grading done in the streets occupied by these roads, and the most that they have done is to adjust and level their tracks after the street was raised or lowered to the new grade, while the presence of those tracks in the streets, in some cases, more than doubled the cost of the excavation of the portion of the streets occupied by the roads, while the cost of paving was also increased by the same cause, and claims for extra compensation have been filed for such paving."

It may well be that the foregoing includes the additional cost that must have attended the laying of the pavement between and over the defendant's crossties and sleepers, that were put down in advance of the work of paving, on the streets named in schedules B and C, for the report proceeds, without intermission, as follows : " In many of these streets advantage of these changes was taken to lay down new lines of road—the companies putting down their ties

and sills upon the roadbed as made by the contractors and keeping just in advance of the laying of the pavement, leaving the rails to be subsequently laid, and the streets thus graded and paved and their roadbed prepared without expense to them. It was claimed that there could be no railroad until the rails were laid, and as the rails were not laid until the improvements were completed there was no railroad upon which any part of the expense could be charged."

After a review of all the leading facts bearing upon the claims against the several railroad companies, the report concludes with the following statement and recommendation, which includes the excerpt stated above as having been quoted on the brief for the defendant: "What liabilities their charters impose were accepted by them as conditions of the grant. There does not seem to be any room for doubt as to the meaning and intent of the first provision of their charters. These roads deny that under the subsequent provisions they are liable for any portion of the expense of street improvements, and the action of the late District authorities would seem to indicate that they have yielded in some degree to their claims. Under these circumstances it might be proper that Congress should, by appropriate legislation, give an authoritative construction to those charter provisions, and if these should be found to be too burdensome to make such modifications as may seem to be just and then require these roads to conform to such provisions. There is a difficulty in undertaking to fix an arbitrary amount which should be charged to these roads on this account, inasmuch as all the reasons urged by them why they should be relieved from a portion, or the whole of this expense, would apply with equal force if urged by the individual property holder."

We have seen how this difficulty was met in the case of the "individual property holder." As assessments had been actually made against the abutting lot owners by the Board of Public Works, the subsequent legislation of Congress—the acts of 1878—had the effect to cure the irregu-

larities in their proceedings and to fasten the charge upon the abutting lots. See *Mattingly* v. *District of Columbia, supra.* The only relief for the lot owner was in the power given to revise the assessments and correct errors of amounts therein and issue " drawback " certificates therefor.

The railroad companies, by reason of the action, or non-action, of the Board of Public Works in regard to the claims against them, were not included in that legislation. Congress simply took no action as regards them ; it neither imposed a new liability nor relieved them from an old one. After the change in the District government, the authorities, after much groping in the dark and making some mistakes, adopted the theory maintained in this suit and made up the account for the actual paving done, without extra charges for the additional expense thereof caused by the tracks. This appears in the report of the Board of Audit, and exhibits thereto, presented June 12, 1882. This suit had then been pending more than a year. That report says :

" Under authority of the act of June 19, 1878, ' to provide for the revision and correction of assessments for special improvements,' the present Board of Commissioners in revising and correcting said assessments, charged against the railroads the cost of improving that portion of all streets occupied by their tracks, for which they were believed to be chargeable, and to that extent relieved the property abutting on such streets. That the authority of the Commissioners to make such revision and correction of these assessments being denied, and payment of the sums charged being refused, suits for the recovery of the same were instituted and are now pending."

That report was accompanied by correspondence between the Commissioners and their counsel from 1874 to 1878, chiefly on the right claimed to assess the railroad companies as owners of land, just as abutting lot owners had been. That right, of course, could not be maintained. The companies owned no land in the streets, but a mere

license to use them ; and their liability necessarily arose under their charters or not at all.

The communication or report ·of the Commissioners, made March 1, 1880, to which reference is made in the opinion of the court, was in response to an inquiry concerning the claims against the railroad companies, made by the Senate Committee for the District of Columbia. After stating the causes for delay and referring to the report and suggestions of the Board of Audit, made in 1875, the Commissioners said : " No action was taken by Congress upon this report. The taxes referred to have been the subject of constant litigation and conflict of legal opinion. The question of the legality of the special assessments was only decided by the Supreme Court of the United States, on appeal, on the 16th of December, 1878, subsequent to the passage of an act for the enforcement of the special assessments, approved June 19, 1878. Under this act it became necessary to revise the special assessments, made in pursuance of the act of August 10, 1871, remaining unpaid. Before this revision was completed, a further act of Congress, approved June 27, 1879, required that the said special assessments, made in pursuance of the above-mentioned act, should also be revised and extended the time of payment, with an abatement of penalties and a reduction of interest, where not specially excepted, until October 1, 1879. ·Owing to the late date of the passage of the act and the enormous labor of the revision, involving the reexamination of all vouchers paid for special improvements by the Board of Public Works and their successors, it has not been possible to complete the required work. Congress having taken no action upon the report of the Board of Audit heretofore referred to, the Commissioners in revising were compelled to base their revision upon the opinion of the attorney of the District as to the requirements of existing law. They therefore, in answer to a request of the Senate Committee on the 16th ultimo, submitted a statement of the several accounts, so far as revised, but

have not thought it advisable to take decisive action for the collection of the amounts which have been or may be found due until the revision shall have been completed and shall have received the sanction of Congress. The report of the clerk in charge of the revision of assessments, giving in full the opinion of the attorney bearing upon this question, is herewith inclosed. The board is of opinion that this matter having been referred in 1874 to the Board of Audit, and thereby virtually removed from the jurisdiction of the Commissioners, further legislation is desirable before final action is taken."

The report was accompanied by an exhibit showing the charges made against the defendant, among others, identically as maintained in this suit. Again Congress took no action, and the Commissioners instituted the suit. The causes of delay in the matter previously, and those for acting without further direction from Congress, are stated in a most satisfactory manner in a letter to the Commissioners, also found in the record, from their counsel, Albert G. Riddle, Esq., who brought the suit. After stating the legislation on the subject of paving, etc., he says: "The act of June 20, 1874, created a Board of Audit and enjoined upon it the special duty of reporting to Congress the amount due the District on account of the above premises. This was complied with February 15, 1875. A member of the first Board of Commissioners informed me that the Commissioners of that time supposed that Congress, being informed, would take action in the premises, and awaited the result. None was had, and, as appears, in 1877 the Commissioners referred the question to their attorney, who held that the District was without remedy in the premises, but that the cost of the work chargeable to the railroads could in no event be cast upon abutting property owners. In January, 1880, the Senate called upon the Commissioners for a report as to these claims. This matter was brought to the notice of the District Committee of the House during the second session of the last Congress, who called the

officers of the company before them and an understanding was had between them and the Commissioners that amicable cases should be made up and submitted to the Supreme Court of the District, and the matters adjudicated.   It was not until that time that I became aware of the existence of these claims as still subsisting.   The agreement to make up cases was not reduced to writing, nor were the counsel of the companies and District present when it was made before the committee.   When advised of their action, I drew up statements of the cases and applied to the several attorneys of the railroads to join in making up the proposed cases. Several months from March, 1880, were fruitlessly spent in this endeavor, when I ascertained that it was the purpose of the railroads to plead the statute of limitations to the claims of the District.   I then commenced the suit," etc.

The apprehension of counsel in respect of the plea of limitations was justified.   That defence was made.   Judgment was rendered against the defendant for the full amount of the claims, and affirmed by the court in General Term. But on appeal to the Supreme Court of the United States the judgment was reversed on the ground that limitation was well pleaded, because the District of Columbia was not a sovereignty and exempt as such from the bar of the statute.   132 U. S. 1.

The foregoing review of the history of this long continued controversy, supplementing that given in the opinion agreed upon by my brothers, has been made, not because it ought to have any real weight in the determination of the particular question of liability under the schedules of claims now under consideration, but because it tends to show, not only that claims in the nature of those maintained in this suit have always been asserted on behalf of the District, save, perhaps, during the sway of the Board of Public Works, but also that the equities of the situation are, to say the least, not *all* on the side of the defendant. Moreover, it furnishes complete justification for the apparently harsh and arbitrary act of Congress in coupling with

the relief against forfeiture prayed for by the defendant the independent provision under which the case was brought to trial in this court.   That act was a tardy response to the suggestion of the Board of Audit made in 1875, and was an apparently harsh exercise of power ; but it was intrinsically just.

I come now to the questions of law directly involved in the claims made in these two schedules (B and C), without regard to any considerations founded in the history of the general relations of the parties.

When the Board of Public Works undertook to pave the streets named in these schedules, it is said that there was some sort of a verbal understanding that the defendant might lay its crossties and sleepers immediately in advance of the work of paving, as it progressed, without incurring a charge for paving between the tracks under the terms of the charter.   At the suggestion of the board, it is said the president of the defendant company addressed the letter thereto which appears in the opinion of my brothers.   The response was the adoption by the board of the following resolution :

" Resolved, That when this board shall have authorized the paving of a roadway of any street or avenue along which *any horse railroad company* is empowered to lay railroad tracks, *such* company shall have the privilege of laying, at its own expense, the sleepers, crossties and other wood work of such tracks in advance of paving, so as to prepare the track for the rails and thus prevent the necessity of disturbing the pavement for this purpose at a future time, said work to be done under the direction of the board."

In the construction of all grants of franchises and concessions of special privileges and exemptions, it is the sound and well-established rule to resolve every doubt in favor of the sovereign or public grantor and to concede to the grantee no power, privilege or exemption that has not been expressly conferred, or that is not to be implied, necessarily, from the terms of the grant.   Tested by that rule, the fore-

going resolution does not make an agreement with the defendant, though in response to the letter of its president, that the paving shall be without charge, either present or future.    Whilst precise and definite in other respects, it omits recital, or mention even, of that important particular. Had the board intended to make a contract with defendant it would have accepted its proposition formally and directly.  . Instead of so doing, it passed a resolution, applicable to all railroad companies alike, in which it carefully avoided any promise of exemption from liability to assessment under the provisions of their charters.    It was, by its express terms, a privilege given to all companies, for private and public convenience, to build their tracks part at a time.    Nothing more can be predicated of it.    Let us suppose that another company was here claiming this exemption—a company that had written no letter, asked for no favors, and had had no negotiations with the board.    Could it be said that it had a contract or agreement with the board by which it was released from the liability to pay for its proportion of the pavement?    Looking to the resolution alone, is there a word in it to justify any such conclusion?    I think not.    And yet that resolution was unquestionably and confessedly intended for the benefit of one company as much as another.

I will now consider the question from other points of view, assuming, for the purposes of the discussion, that the construction claimed by the defendant is the correct one. I agree that the defendant was not compelled to construct its tracks along those streets at that time.    The board could not have compelled them to do so.    They had, under the acts of Congress, from two to three years to enter upon the exercise of the franchise.    I fully concede also that the defendant could not be charged with paving that had been laid before it entered into occupation of a street.    For obvious reasons, it was not intended that it should be.    It could receive no special benefit from such pavement because it would be compelled to remove it, at considerable expense.

in order to lay its crossties and sleepers as a necessary foundation for its rails.    Its only obligation in such cases was to relay the pavement properly and keep it in repair.

As I view the question of defendant's liability, its solution necessarily depends upon the answers that must be made to the two following questions:    1. Whether putting down its crossties and sleepers, ready for the subsequent laying of the rails, was an occupation of the streets, under the grant of the charter, such as to render defendant liable thereunder for a proportion of the cost of new pavement?    2. If it was, did the Board of Public Works have authority to contract with defendant for an exemption from such liability, or to so act as to estop the District from its assertion?

1. In my opinion, the laying of the crossties and sleepers, ready for the reception of the rails and operation of the road thereafter, was an occupation of the streets under the power conferred by the charter.    The conferred easement was taken.    The right of election as to time was then exercised; there was user of the franchise.    The grant of the right of way was accepted, and the right thereto fixed, so that a subsequent entry by another company would have been an invasion.

The grant having been accepted, the conditions necessarily attached; they were inseparable.    Unquestionably, that must have been the effect had there been no agreement with the Board of Public Works to the contrary. *Marion, etc., Railroad Co.* v. *Ward;* 9 Ind. 123, 125 ; *Morris, etc., Railroad Co.* v. *Hudson T. R. Co.*, 25 N. J. Eq. 384 ; *Gilkey* v. *Watertown*, 141 Mass. 317.    The elaborate letter of the defendant and the resolution of the board in response thereto, if taken as an agreement to the proposition, indicate the apprehension of both in respect of the result, unless forestalled by some agreement.

Whether the defendant made immediate and complete use of the occupation it had begun, in so far as the question here involved is concerned, I regard as wholly immaterial.

2. Whilst the right to regulate the improvement of the streets and the use of the same had been conferred upon the Board of Public Works in general terms, and in the exercise thereof it might permit the defendant to construct its tracks, part at a time, its power clearly did not extend to the exemption of defendant from a liability on an obligation that had been imposed by Congress. What it could not do directly it could not do indirectly.

In relation to an arrangement of somewhat similar character between the same Board of Public Works and another corporate holder of franchises in the city of Washington, we had occasion, in another case, to announce a doctrine that is equally applicable here: " Neither the Governor nor the Board of Public Works having the power to bind the District by express contract, it is idle to contend that they could accomplish the same purpose indirectly, by acquiescing in the usurpation of power by the market company, and permitting it to proceed upon the assumption that a contract right existed, and thus work an estoppel upon the public and the succeeding District government." *Washington Market Co. v. District of Columbia*, 6 App. D. C. 34 ; see also *People ex rel. City of Detroit* v. *Railroad Co.*, 41 Mich. 413, 414.

I think the correct view of the legal effect of the arrangement was taken by the Supreme Court of the District, sitting in General Term, when the case was tried there, and is well expressed in the language of Mr. Justice Cox, who delivered the opinion of the court, as follows : " It seems to us, as this company had elected to construct its road in the street and have the use of the pavement which the board was laying down, and complete its road after the pavement was completed, that this process of constructing its road was to be treated as one thing ; that it could not divide it up so as to get the benefit of the pavement that the board was laying down and yet avoid the charge that the law imposed when it constructed its road simultaneously with the work done by the board ; that when it did use and

occupy the street for the purpose of its railroad it should reimburse the board for the paving that was done for its benefit; and that when Mr. Thompson (referring to the letter to the board) said that it was willing to lay its stringers and crossties 'provided the paving be done without charge to us,' he should have said, 'provided that when the road is completed, and when we occupy the street hereafter, we will reimburse you for the work you are now doing.'" 4 Mackey, 234.

The foregoing accords with the view, also, that by the terms of the resolution itself, payment of the paving charge was postponed, merely, to the time of final completion and use of cars. This power of postponement of the assessment and the enforcement of the payment might have been in the board; but the power to grant a complete exemption could not exist without nullification of the express command of Congress.

I regard it as unfortunate that the record is silent in respect of the exact time that elapsed between the putting down of the sleepers and crossties and the imposition of the rails and operation of cars. It is a fact that could have been shown, it is to be presumed, with precision by the records of the defendant. By reason of this omission, and the nature of the agreement as to the facts, the question of bad faith is eliminated from the case. Assuming the good faith of the transaction does not alter the legal effect of the acts done thereunder.

With the greatest respect for the opinion of my brothers, on all questions, I am nevertheless constrained to regard their view of the effect of this agreement and the part construction of the railroad under it as erroneous. Moreover, as an established doctrine, it is fraught with danger to public interests in the future. Under it, what is there to prevent the execution of similar plans and agreements in future extensions of lines of street railways? Rights to extend along other unpaved streets may be in existence, or may be given, with liberal time in which to begin the work

of construction or operation.   Building may be postponed
in anticipation of intermediate paving by the municipal au-
thorities, and an agreement may be had with them by which
miles of track, ready to receive the rails, may be constructed
immediately in advance of the work of paving, and the rail-
way company relieved from payment of its proportional part
thereof, and the conditions of its charter evaded, because it
cannot be considered a " railroad " until · such time as its
rails shall have been added to the structure prepared for
their reception.   I cannot yield assent to the soundness of
an argument that would lead to such a conclusion ; nor can
I believe that Congress contemplated the possibility of such
a result when defendant's charter was granted.

I can see no weight in the suggestion that if the defend-
ant had waited the full time, or less, allowed for its con-
struction under the act of Congress, it would have had the
benefit of the pavement without paying for it.   Had it waited
to put down its crossties and sleepers until after the paving
had been done, certainly it could not have been charged
with any part of the original cost.   But it did not wait.
Having the right, it elected not to do so.   There was method
in its action.   Had it waited, it would have had additional
expense in removing the pavement and putting down its
wooden foundations and supports for its rails.   The obstruc-
tions offered by these wooden foundations necessarily in-
creased the difficulty and expense of the pavement to the
District, for which it received no compensation.   They
added to the charges assessed against the abutting lot own-
ers, who had no voice in the arrangement and were power-
less to prevent its execution.   The arrangement was profit-
able to the railroad company, at any rate, and, despite the
specious reasons given in the letter of its president, I can
but doubt that its action was prompted by a desire to sub-
serve the interests of the public.

It is useless, however, to prolong the discussion.   Setting out
to give some reasons for my failure to assent to the judgment
rendered, I find that I have far exceeded the limit contem-

plated when I began.    I will therefore conclude with a statement of the amount of the judgment that I believe should be rendered for the plaintiff.    Taking all the schedules together, excepting D, which is excluded for the reasons given, there remains the sum of $137,544.43.    Deducting from this the agreed credit of $5,330.01, for the cobblestones, leaves $132,214.42, for which sum, with interest, the District ought to have judgment.

On March 30, 1896, *Mr. Nathaniel Wilson* and *Mr. W. D. Davidge,* for the defendant company, filed a motion for modification of the judgment by omitting therefrom the requirement of interest on the sum adjudged to be due from the railroad company.

*Mr. S. T. Thomas* and *Mr. A. B. Duvall* opposed the motion.

On April 16, 1896, the motion was overruled, Mr. Justice MORRIS delivering the opinion of the Court:

A motion has been filed in this cause for a modification of the judgment therein, so as to omit from the judgment the requirement of the payment of interest on the principal sum adjudged to be due from the railroad company to the District of Columbia, and six different grounds are assigned for such modifications; and briefs have been filed by the parties both in support of the motion and in opposition to it.

The question raised is one which was not omitted from our consideration when the main issue was determined by us; and the judgment was not formulated without due deliberation thereon.    We are unable to find in the reasons suggested by counsel any good ground for the proposed modification.

We think it may be stated as the general rule of the common law of our country, different, it is true, from the former rule in England prior to the statute of 3 and 4 William 4, chap. 42, but perfectly well settled with us, "that if a debt

ought to be paid at a particular time, and is not then paid, through the default of the debtor, compensation in damages, equal to the value of the money, which is the legal interest upon it, shall be paid during such time as the party is in default." See American Leading Cases, vol. 1, 616, where the cases upon the subject are collated and discussed. And this rule has received the approval of the Supreme Court of the United States. *Loudon* v. *Shelby County*, 104 U. S. 771; *Chicago* v. *Tebbetts*, 104 U. S. 120; *Young* v. *Godbe*, 15 Wall. 562; *Curtis* v. *Innerarity*, 6 How, 146. It is true that, in· order to be allowed, it should be claimed in the declaration; but when it is so claimed, there can be no doubt of the right of a plaintiff, upon a proper showing, to recover interest as well as principal.

Indeed, we do not understand this rule to be controverted by the defendant. The argument seems to be rather to the effect that interest should not be allowed in this case, because the act of Congress referring the cause to this court requires merely the determination of the amount of the *indebtedness* of the railroad company to the District and makes no special mention of interest, and because by existing legislation the determination of the matter of interest is remitted to the jury, and is not, as it is claimed, left to the court to settle. And it is also urged that, by the decision of the Supreme Court of the United States in the case upon the question of the statute of·limitations, the claim of the plaintiff against the defendant ceased to have any legal existence, and that the subsequent waiver of the railroad company did not revive the. right to interest.

We cannot regard this argument as well founded. The decision of the Supreme Court did not extinguish any legal right of the plaintiff; it simply determined that the plaintiff had lost its remedy. The statute of limitations, it is perfectly well settled, operates upon the remedy, not upon the right. And the waiver of the defendant was not in any manner a revival of the right of the plaintiff, but merely a waiver of its defences under the statute of limitations. It

was an agreement on the part of the railroad company to vacate the judgment of the Supreme Court of the United States; as well as the judgment of the Supreme Court of the District of Columbia, and to withdraw its pleas of the statute of limitations and of want of notice.    And the result of that waiver and of the act of Congress referring the cause to this court was to leave the cause for trial *de novo* by this court, acting both as court and jury, upon the pleadings in the cause, exclusive of the pleas withdrawn by the waiver, and upon such testimony as should be submitted to the court. The special direction of the act of Congress is "*from and upon the record and pleadings and proofs,*" to determine what indebtedness, if any, is due from the railroad company to the District.    In the declaration, which was the principal pleading of the District of Columbia, the claim of indebtedness was the sum of $161,622.52, "*with interest thereon from the 25th day of February, 1880,*" on which date, it is stated, the account was presented to the defendant and payment was refused by it.    By the pleadings, interest was made as much a part of the claim as the principal itself; and it would be a palpable violation on our part of the mandate of Congress if we disregarded so essential a part of the claim, made so, as we have seen, by the universal rule of our common law.    Indeed, it is not at all certain that, under the circumstances, interest might not have been allowed from the years 1872, 1873 and 1874, when the work was done for which the liability of the railroad company was incurred.    But as it was not claimed by the District for any time prior to February 25, 1880, we have not deemed it proper to go back of that date.

It is urged on behalf of the defendant, that interest should not be allowed, because it was not urged before the special commissioner, and no interest was found due by that officer's report; and because neither in the oral argument nor in the brief on behalf of the plaintiff was payment of interest urged.    But plainly there is no force in this argument.    What the duties of the special commissioner were

is quite apparent. His exceedingly valuable report in this case did not supersede action by the court, but merely supplied a basis for it. And it is not apparent that the District of Columbia anywhere abandoned its claim to interest as part of the indebtedness due to it from the defendant.

If any liability whatever accrued on the part of the defendant to the plaintiff—and we have held that such liability did accrue in 1872, 1873, and 1874, on account of the work then done by the plaintiff for the defendant—interest, when claimed, followed as a necessary incident of such liability, as soon as the defendant became in default.

The motion for a modification of the judgment cannot, therefore, be allowed.